UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMAITON



March 2013

# WATCHLISTING GUIDANCE

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMAITON

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

# 2013 WATCHLISTING GUIDANCE
# TABLE OF CONTENTS

**CHAPTER 1: WATCHLISTING PROCESS AND PROCEDURES .......................................5**

I.      INTRODUCTION...........................................................................................................5

II.     WATCHLISTING AUTHORITIES ...............................................................................6

III.    CONSTITUTIONALLY PROTECTED ACTIVITIES.................................................10

IV.     WATCHLISTING POLICIES ......................................................................................11

V.      WATCHLISTING STANDARD: IDENTIFYING AND SUBSTANTIVE
        DEROGATORY CRITERIA ........................................................................................12

VI.     WATCHLISTING PROCESS OVERVIEW.................................................................13

VII.    ROLES AND RESPONSIBILITES FOR THE WATCHLISTING AND SCREENING
        COMMUNITY...............................................................................................................16

VIII.   QUALITY CONTROL MEASURES ...........................................................................17

IX.     NOMINATION PROCEDURES ..................................................................................20

X.      PROCEDURES TO REMOVE AN INDIVIDUAL FROM THE WATCHLIST ...27

XI.     REDRESS PROCEDURES...........................................................................................28

XII.    PERIODIC REVIEW OF THE WATCHLISTING GUIDANCE ..............................29

**CHAPTER 2: MINIMUM IDENTIFYING CRITERIA............................................................30**

I.      BIOMETRIC NOMINATIONS.....................................................................................30

II.     MINIMUM BIOGRAPHIC NOMINATION REQUIREMENT...................................30

III.    MINIMUM BIOGRAPHIC INFORMATION REQUIRED FOR EXCEPTIONS TO THE

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

MINIMUM SUBSTANTIVE DEROGATORY STANDARDS FOR TERRORIST WATCHLISTING..........................................................................................................32

**CHAPTER 3: MINIMUM SUBSTANTIVE DEROGATORY CRITERIA .........................33**

I.        INTRODUCTION AND PURPOSE .............................................................................33

II.       REASONABLE SUSPICION........................................................................................33

III.      KNOWN TERRORISTS................................................................................................35

IV.       SUSPECTED TERRORISTS .......................................................................................37

V.        EXCEPTIONS TO SUPPORT IMMIGRATION AND VISA SCREENING ACTIVITIES BY DHS AND DOS....................................................................................................42

VI.       SPECIAL CONSIDERATIONS ...................................................................................45

VII.      EXAMPLES OF TERRORISM AND/OR TERRORIST ACTIVITIES.....................47

**CHAPTER 4: NO FLY, SELECTEE AND EXPANDED SELECTEE LISTS IMPLEMENTATION GUIDANCE............................................................................................50**

I.        BACKGROUND...........................................................................................................50

II.       PRE-CONDITIONS FOR PLACEMENT ON THE NO FLY OR SELECTEE LIST.50

III.      NO FLY LIST CRITERIA............................................................................................51

IV.       FURTHER CLARIFICATION OF NO FLY CRITERIA ............................................51

V.        SELECTEE LIST CRITERIA ......................................................................................54

VI.       EXPANDED SELECTEE LIST CRITERIA ................................................................54

VII.      ACTIONS BASED UPON POSITIVE MATCHES TO THE NO FLY, SELECTEE, OR EXPANDED SELECTEE LISTS ..................................................................................54

VIII.     IMPLEMENTATION GUIDELINES ..........................................................................55

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

IX.      SPECIAL SITUATIONS ............................................................................................. 56

X.       NOMINATIONS THAT ARE INELIGIBLE/NOT SUITABLE FOR EITHER THE NO
         FLY OR THE SELECTEE LIST ................................................................................. 57


**CHAPTER 5: ENCOUNTER MANAGEMENT AND ANALYSIS ....................................... 58**

I.       INTRODUCTION AND PURPOSE ........................................................................... 58

II.      PROCESSING TERRORISM INFORMATION FROM ENCOUNTERS WITH
         POSITIVELY IDENTIFIED KNOWN OR SUSPECTED TERRORISTS ................. 59

III.     CATEGORIES OF TERRORISM INFORMATION FROM ENCOUNTERS WITH
         POSITIVELY IDENTIFIED KNOWN OR SUSPECTED TERRORISTS OF
         POTENTIAL INTEREST ........................................................................................... 65

IV.      ENCOUNTER MANAGEMENT ACTIONS .............................................................. 69

V.       ROLES AND RESPONSIBILITIES FOR UPDATING EXISTING KNOWN OR
         SUSPECTED TERRORIST RECORDS AND NOMINATING NEW KNOWN OR
         SUSPECTED TERRORISTS BASED ON INFORMATION FROM POSITIVE
         ENCOUNTERS .......................................................................................................... 71

VI.      RESPONSIBILITY TO COORDINATE ANY ACTIONS CONTEMPLATED BASED
         ON INFORMATION FROM ENCOUNTERS WITH A KNOWN OR SUSPECTED
         TERRORIST .............................................................................................................. 73

VII.     EXAMPLES OF TERRORISM INFORMATION TYPICALLY AVAILABLE FROM
         ENCOUNTERS .......................................................................................................... 74

VIII.    OBTAINING ENCOUNTER INFORMATION THROUGH TSC'S DAILY
         ENCOUNTER REPORTS ......................................................................................... 77


**APPENDIX 1**: DEFINITIONS

**APPENDIX 2:** HSPD-6

**APPENDIX 3:** TSC MOU

**APPENDIX 4:** ADDENDUM B TO TSC MOU

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

**UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION**

**APPENDIX 5:** INFORMATION SHARING MOU

**APPENDIX 6:** EXECUTIVE ORDER 13388

**APPENDIX 7:** DOJ PROTOCOL ON TERRORIST NOMINATIONS

**APPENDIX 8:** REDRESS MOU

**APPENDIX 9:** PRESIDENTIAL MEMORANDUM REGARDING 12/25/2009 TERRORIST ATTACK

**APPENDIX 10:** ACRONYMS AND ABBREVIATIONS

**APPENDIX 11:** SUMMARY OF CHANGES AND UPDATES FROM THE 2010 WATCHLISTING GUIDANCE

**UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION**

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

## CHAPTER 1: WATCHLISTING PROCESS AND PROCEDURES

### I.    INTRODUCTION

1.1    A key foundation for TERRORIST[1]-related screening is the U.S. Government's TERRORIST watchlisting process managed by the Terrorist Screening Center (TSC). The TSC was established by the Attorney General, acting through the Director of the Federal Bureau of Investigation (FBI), and in coordination with the Secretary of State, the Secretary of Homeland Security, and the then Director of Central Intelligence for the Intelligence Community (IC). The TSC is supported by the National Counterterrorism Center (NCTC), the Department of State (DOS), the Department of Homeland Security (DHS), the IC, the FBI, Law Enforcement Agencies, Regulatory Agencies and Diplomatic Bureaus. The TSC has created and maintains the Terrorist Screening Database (TSDB) or Terrorist Watchlist to serve as the U.S. Government's consolidated watchlist for TERRORISM SCREENING INFORMATION.

1.2    The current TERRORIST watchlisting process supports the U.S. Government's efforts to combat TERRORISM by: (1) consolidating the U.S. Government's Terrorist Watchlist in the TSDB; (2) helping SCREENERS and intelligence agencies accurately identify individuals on the Terrorist Watchlist; (3) providing SCREENERS with information to help them respond appropriately during ENCOUNTERS with KNOWN or SUSPECTED TERRORISTS; and, (4) subsequently collecting information about the KNOWN or SUSPECTED TERRORIST for use in assessing threats and conducting investigations.[2] The collected information may be incorporated into the Terrorist Identities Datamart Environment (TIDE) and TSDB to enhance the records of KNOWN or SUSPECTED TERRORISTS and may be made available to the wider watchlisting and screening communities. Today, the TSDB also includes information about certain foreign nationals who are associated with TERRORISM, TERRORIST ACTIVITY, or KNOWN or SUSPECTED TERRORIST(S) but for whom there is insufficient DEROGATORY INFORMATION to be independently watchlisted. This may include certain immediate family members of KNOWN or SUSPECTED TERRORISTS, or known associates of KNOWN or SUSPECTED TERRORISTS. These additional categories of records (also known as exceptions to the REASONABLE SUSPICION standard) are maintained to support immigration and screening activities primarily conducted by DOS and DHS.[3]

---

[1] *See* Appendix 1, Definitions for words or phrases appearing in all capitalized letters throughout this Watchlisting Guidance.

[2] A SCREENER is a Department or Agency that is authorized to conduct TERRORISM screening to determine if an individual is a possible match to a KNOWN or SUSPECTED TERRORIST in the TSDB. The term "SCREENER" is used throughout this document as a general reference to a government official who compares an individual's information with information in the TSDB to determine if an individual is in the TSDB. Certain SCREENERS have components which perform both screening and law enforcement duties and law enforcement officials who engage in such activities may normally describe their targeting or other actions in this context as other than "screening." For ease of reference, government officials who compare an individual's information with information in the TSDB will be referred to in the Guidance as "SCREENERS." The internal guidance set forth herein is not intended to create or confer any rights, privileges, or benefits in any matter, case, or proceeding. *See United States v. Caceres*, 440 U.S. 741.

[3] *See* Chapter 3, Section V, *infra,* for more details. Aside from these limited exceptions, references to the TSDB in this Watchlisting Guidance denote the TSDB as containing information about KNOWN or SUSPECTED TERRORISTS.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

**UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION**

1.3   This Watchlisting Guidance has been developed to help standardize the watchlisting community's nomination and screening processes. It is important to remember, however, that watchlisting is not an exact science. There are inherent limitations in any primarily name-based system and analytic judgments may differ regarding whether subjective criteria have been met. Given these realities, the U.S. Government's watchlisting process attempts to safeguard the American people from a TERRORIST attack while safeguarding privacy, civil rights and civil liberties.

1.4   Thus, when reasonable minds could disagree on a record, a NOMINATOR will make a determination in favor of sending the nomination to NCTC for consideration and additional review. The TSC has the final decision authority regarding watchlisting determinations and will add an individual's name to the TSDB, consistent with TSC Actions and Processes as further described in Paragraph 1.56.

## II.   WATCHLISTING AUTHORITIES

1.5   On September 16, 2003, the President issued Homeland Security Presidential Directive 6 (HSPD-6), which directed the Attorney General to "establish an organization to consolidate the U.S. Government's approach to TERRORISM SCREENING and provide for the appropriate and lawful use of TERRORIST INFORMATION in screening processes."[4] TERRORIST INFORMATION was specifically defined to mean "information about individuals known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM." HSPD-6 also directed the heads of Executive Departments and Agencies to provide to NCTC on an on-going basis, "all appropriate TERRORIST INFORMATION in their possession, custody, or control," to the extent permitted by law.

1.6   The intent of HSPD-6 was to consolidate all TERRORISM INFORMATION at the Terrorist Threat Integration Center (TTIC) – whose functions were assumed by NCTC[5] – in a classified database that would then extract Unclassified, For Official Use Only (U//FOUO) TERRORIST IDENTIFIERS for passage to the new organization created by the Attorney General. Thus, concurrent with the issuance of HSPD-6, the TSC was established via the *Memorandum of Understanding on the Integration and Use of Screening Information to Protect Against Terrorism (TSC MOU)*, which was signed by the Attorney General, the Secretaries of State and Homeland Security, and the Director of Central Intelligence (on behalf of the IC).[6]

---

[4] *See* Appendix 2, HSPD-6.

[5] *See* FN 8, *infra*.

[6] *See* Appendix 3, *TSC MOU*; *see also* Appendix 4, Addendum B to the *TSC MOU*. In 2004, the Secretaries of State, Treasury, and Defense also became signatories to the *Memorandum of Understanding between the Intelligence Community, Federal Law Enforcement Agencies, and the Department of Homeland Security Concerning Information Sharing*, dated March 4, 2003 (*Information Sharing MOU*). By doing so, they agreed that all provisions of the *TSC MOU* and the *Information Sharing MOU* apply to all entities that are or become a part of their respective Departments.

**UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION**

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

1.7   Under HSPD-6, consistent with the U.S. Constitution and applicable laws, including those protecting the rights of all Americans, the TSC was to develop and maintain an unclassified database containing the most thorough, accurate, and current identity information possible about KNOWN or SUSPECTED TERRORISTS. The TSC created the TSDB to meet these goals.[7] The TSDB is also known as the Terrorist Watchlist. The TSDB receives TERRORIST IDENTIFIERS from two sources: NCTC's TIDE provides information concerning KNOWN or SUSPECTED international TERRORISTS and the TSC's Terrorist Review and Examinations Unit (TREX) provides the identities of KNOWN or SUSPECTED domestic TERRORISTS who have no link to international TERRORISM. NCTC's TIDE contains identifying and substantive DEROGATORY INFORMATION on KNOWN or SUSPECTED international TERRORISTS and the FBI's Sentinel system contains supporting information regarding purely domestic TERRORISTS.

1.8   Pursuant to Paragraph (2) of HSPD-6, the NCTC is mandated to "provide [TSC] with access to all appropriate information or intelligence in the [NCTC's] custody, possession, or control that [TSC] requires to perform its functions." NCTC fulfills this function by providing TSC's TSDB with U//FOUO information about KNOWN or SUSPECTED TERRORISTS from NCTC's TIDE and by providing access to TIDE Online, a read-only copy of the TIDE database, to those in the watchlisting community who require access.

1.9   NCTC's establishment by the President was codified by section 1021 of the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA).[8] Pursuant to IRTPA, NCTC shall "serve as the central and shared knowledge bank on KNOWN and SUSPECTED TERRORISTS and international terror groups." In addition, NCTC "may, consistent with applicable law, the direction of the President, and guidelines referred to in [the statute], receive intelligence pertaining exclusively to domestic counterterrorism from any Federal, State, or local government or other source necessary to fulfill its responsibilities and retain and disseminate such intelligence."[9]

   1.9.1 All Departments and Agencies are required to provide NCTC with all TERRORISM INFORMATION. Due to the amount of information involved, only a subset of this information is provided in the NCTC prescribed format designed to facilitate direct ingestion into the TIDE. NOMINATING DEPARTMENTS and AGENCIES, however, should remain focused on reviewing and watchlisting TERRORISM INFORMATION from datasets most likely to contain information about KNOWN or SUSPECTED TERRORISTS.

---

Addendum B to the *TSC MOU*, which superseded Addendum A, incorporates by reference all provisions of the *Information Sharing MOU*. *See* Appendix 5.

[7] The TSDB consolidates the U.S. Government's TERRORISM screening and lookout databases into a single integrated TERRORIST identities database.

[8] NCTC initially was created by Executive Order 13354 (August 27, 2004) to serve as the primary organization in the U.S. Government for analyzing and integrating all intelligence possessed or acquired by the U.S. Government pertaining to TERRORISM and counterterrorism, excepting purely domestic counterterrorism information. Executive Order 13354 was revoked by Executive Order 13470 (July 30, 2008) after NCTC was codified in IRTPA section 1021.

[9] In addition to the provision of domestic KNOWN or SUSPECTED TERRORISTS directly to the TSC, the TSC's TREX unit also provides the identities of international KNOWN or SUSPECTED TERRORISTS to NCTC for inclusion in TIDE.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

1.10  On August 27, 2004, the President issued Homeland Security Presidential Directive 11 (HSPD-11), which "builds upon HSPD-6," to enhance TERRORIST-related screening to more effectively detect and interdict SUSPECTED TERRORISTS and TERRORIST ACTIVITIES. HSPD-11 defines "SUSPECTED TERRORISTS" as "individuals known or reasonably suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM . . . and TERRORIST ACTIVITIES."

1.11  To enhance information sharing, another key component of the consolidated terrorist watchlisting system, the President issued Executive Order 13388, which provides that the head of each Agency that possesses or acquires TERRORISM INFORMATION shall promptly give access to that information to the head of each other Agency that has counterterrorism functions.[10]

1.12  On June 5, 2008, the President issued Homeland Security Presidential Directive 24 (HSPD-24) to further build upon the TERRORIST screening policies announced in HSPD-6 and HSPD-11 to protect the nation from TERRORISTS by enhancing the use of biometrics. In HSPD-24, the President directed that ". . . agencies, shall, to the fullest extent permitted by law, make available to other agencies all biometric and associated biographic and contextual information associated with persons *for whom there is an articulable and reasonable basis for suspicion that they pose a threat to national security*" (emphasis added). HSPD-24 underscores the value of biometrics in achieving effective TERRORISM screening and emphasizes the need for a layered approach to identification and screening of individuals, as no single mechanism is sufficient.

1.13  The relevant TERRORISM screening Presidential Directives use words and phrases to describe a KNOWN or SUSPECTED TERRORIST subject to TERRORIST screening without defining them: "TERRORIST INFORMATION" (HSPD-6), "TERRORISM" (HSPD-6), "appropriately suspected" (HSPD-6), "reasonably suspected" (HSPD-11), and "articulable and reasonable basis for suspicion" (HSPD-24). Thus, previous watchlisting guidance supplied definitions of key terms and the standard that would apply to terrorist watchlisting decisions.

1.14  Neither HSPD-6 nor HSPD-11 defines "TERRORISM and/or TERRORIST ACTIVITIES." While federal law contains numerous definitions of "terrorism"[11], for watchlisting purposes under this Guidance, "TERRORISM and/or TERRORIST ACTIVITIES" combine elements from various federal definitions and are considered to:

    1.14.1  involve violent acts or acts dangerous to human life, property, or infrastructure

---

[10] *See* Appendix 6, Executive Order 13388.

[11] *See* 50 U.S.C. 1801(c) (Foreign Intelligence Surveillance Act (FISA) definition of "international terrorism"); Immigration and Nationality Act (INA) § 212(a)(3)(B)(iii) [8 U.S.C. 1182(a)(3)(B)(iii)] (defining "terrorist activity"); INA § 212(a)(3)(B)(iv) [8 U.S.C. 1182(a)(3)(B)(iv)] (defining to "engage in terrorist activity"); 18 U.S.C. 2331(1) (defining "international terrorism"); 18 U.S.C. 2332(b) (defining "federal crime of terrorism"); Executive Order 13224, 66 Fed. Reg. 49079 (September 23, 2001) (defining "terrorism").

which may be a violation of U.S. law, or may have been, if those acts were committed in the United States; and,

1.14.2   appear to be intended—

    1.14.2.1   to intimidate or coerce a civilian population;

    1.14.2.2   to influence the policy of a government by intimidation or coercion; or,

    1.14.2.3   to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking.

1.15   This includes activities that facilitate or support TERRORISM and/or TERRORIST ACTIVITIES such as providing a safe house, transportation, communications, funds, transfer of funds or other material benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training for the commission of an act of TERRORISM and/or TERRORIST ACTIVITY.

1.16   HSPD-24 speaks in terms of "articulable and reasonable basis for suspicion" to describe a KNOWN or SUSPECTED TERRORIST who should be watchlisted and represents the President's most recent explanation concerning U.S. policy regarding the individuals who pose a threat to national security and should be screened to better protect the American people. Accordingly, that standard has been adopted and is clarified in this Watchlisting Guidance in Chapter 3, Section II.

1.17   On December 16, 2005, in accordance with section 1016 of IRTPA, the President issued a Memorandum for the Heads of Executive Departments and Agencies prescribing the guidelines and requirements in support of the creation and implementation of the Information Sharing Environment (ISE). In Guideline 5 of that Memorandum, the President directed, as he had earlier in Executive Order 13353[12], that the information privacy rights and other legal rights of Americans must be protected and that guidelines be developed and approved to ensure that "such rights are protected in the development and use of the ISE." In December 2006, the President approved for issuance the *ISE Privacy Guidelines* by the Program Manager.[13]

1.18   A second addendum to the *TSC MOU,* Addendum B[14], which supplements and incorporates by reference all provisions of the *TSC MOU*, superseded Addendum A and became effective on January 18, 2007. The Directors of National Intelligence, NCTC, and the TSC joined as signatories in Addendum B. Paragraph 7 of Addendum B introduces the term TERRORIST IDENTIFIERS to more clearly describe the type of TERRORIST identity elements that are deemed

---

[12] *See* Executive Order 13353, Establishing the President's Board on Safeguarding Americans' Civil Liberties (August 27, 2004).

[13] *See* Guidelines to Ensure that Information Privacy and other Legal Rights of Americans are Protected in the Development and Use of the Information Sharing Environment (December, 2006).

[14] *See* Appendix 4, Addendum B to the *TSC MOU*.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

U//FOUO, without regard to the classification of the source material from which it is drawn. TERRORIST IDENTIFIERS include those listed in Addendum B (*i.e.,* names and aliases; dates of birth; places of birth; unique identifying numbers; passport information; countries of origin and nationality; physical identifiers; known locations; photographs or renderings; fingerprints or other biometric data; employment data; license plate numbers; and any other TERRORIST IDENTIFIERS that ORIGINATORS specifically provide for passage to the TSC). For example, email addresses and phone numbers are increasingly useful for screening purposes. ORIGINATORS should mark email addresses and phone numbers as U//FOUO whenever possible and pass these TERRORIST IDENTIFIERS to NCTC to forward to the TSC for inclusion in TSDB. ORIGINATORS are encouraged to provide all relevant and unclassified information, to include social media information when appropriate.

## III.   CONSTITUTIONALLY PROTECTED ACTIVITIES

1.19   **First Amendment**. First Amendment protected activity alone shall not be the basis for nominating an individual for inclusion on the Terrorist Watchlist.[15] The following are examples of protected Constitutional activities:

    1.19.1   **Free Speech.** The exercise of free speech, guaranteed by the U.S. Constitution, includes more than simply speaking on a controversial topic in the town square. It includes such symbolic or other written, oral and expressive activities as carrying placards in a parade, sending letters to a newspaper editor, wearing a tee shirt with a political message, placing a bumper sticker critical of the President on one's car, and publishing books or articles. The common thread in these examples is conveying a public message or an idea through words or deeds. Speech that may be repugnant to ideas of the majority may still be protected by the U.S. Constitution. For the purpose of this Watchlisting Guidance, the right of protected free speech under the U.S. Constitution applies to U.S. PERSONS wherever they are located and to non- U.S. PERSONS located inside the United States. The right of protected free speech, however, is not unlimited and may not extend to some lawless action.

    1.19.2   **Exercise of Religion**. The free exercise of religion covers any form of worship of a deity – even forms that are not widely known or practiced – as well as the right not to worship any deity. Protected religious exercise also extends to dress that is worn or food that is eaten for a religious purpose, attendance at a facility used for religious practice, observance of the Sabbath, raising money for evangelical or missionary purposes, and proselytizing.

    1.19.3   **Freedom of the Press**. Freedom of the press includes such matters as reasonable access to news-making events, the making of documentaries, and the posting of "blogs."

---

[15] The First Amendment does not apply to non-U.S. PERSONS outside the United States. Before submitting nominations, NOMINATORS may consult with their Department or Agency counsel to determine whether a specific person is a U.S. PERSON and whether the questioned activity is entitled to First Amendment protection.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

1.19.4   **Freedom of Peaceful Assembly**.  Freedom of peaceful assembly, often called the right to freedom of association, includes gathering with others to protest government action, or to rally or demonstrate in favor of, or in opposition to, a social cause.  The right to peaceful assembly includes more than just public demonstrations – it includes, as well, the posting of group websites on the Internet, recruiting others to a lawful cause, marketing a message, and fundraising, which all are protected First Amendment activities if they are conducted in support of an organizational, political, religious, or social cause.

1.19.5   **Petition the Government for Redress of Grievances.**  The right to petition the government for redress of grievances includes, for example, writing letters to Congress, carrying a placard outside the city hall that delivers a political message, recruiting others to one's cause, and lobbying Congress or an Executive Agency for a particular result.

1.20  **Equal Protection.**  The Equal Protection Clause of the U.S. Constitution provides in part that: "No State shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."  The U.S. Supreme Court has made it clear that this applies as well to the official acts of U.S. Government personnel.  Nominations, therefore, shall not be based solely on race, ethnicity, national origin, or religious affiliation.  Any activities relating to this Guidance that are based solely on such considerations are invidious by definition, and therefore, unconstitutional.

## IV.   WATCHLISTING POLICIES

1.21  **Watchlisting Disclosures.**  The general policy of the U.S. Government is to neither confirm nor deny an individual's watchlist status.  In addition to the provisions in Addendum B to the *TSC MOU*, which require NOMINATOR approval before TSDB information can be used in any process that might result in public disclosure, the 2007 *Memorandum of Understanding on Terrorist Watchlist Redress Procedures* (*Redress MOU*)[16] requires SCREENERS to contact the TSC if it receives a request for information or records that might reveal an individual's watchlist status.  Approval would also be required from any entity which provided information used by a NOMINATOR during a nomination.  Per the *Redress MOU*, ORIGINATING and NOMINATING AGENCIES are obligated to support SCREENER determinations – both at the administrative level and in litigation – and provide appropriate information, including unclassified substitutes as necessary.  TSC, in conjunction with NCTC, the NOMINATORS, and the Department of Justice (DOJ), as appropriate, will ensure that representations regarding an individual's potential watchlist status are properly coordinated and approved.

1.22  **Legal or Use Restrictions.**  Because information in the TSDB comes overwhelmingly from intelligence sources and methods or sensitive law enforcement techniques, Paragraph 12 of

---

[16] *See* Appendix 8, *Redress MOU*.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

Addendum B to the *TSC MOU*[17] requires that any recipient of information from the TSDB seeking to use TERRORIST identity information in any legal or administrative process or proceeding obtain NOMINATOR approval before doing so. Approval from the entity which provided the information, if other than the NOMINATOR, is also required. Additionally, information from Foreign Intelligence Surveillance Act (FISA) collections may only be used in a proceeding with the advance authorization of the Attorney General. Therefore, any SCREENER seeking to use TSDB information in any process or proceeding must contact TSC so that TSC can assist in obtaining approval from the NOMINATOR, owner of the information, or Attorney General, as required.

1.23 In addition to the foregoing restrictions, there are restrictions on sharing information with foreign governments. Any TERRORIST IDENTIFIER (as described in Addendum B to the *TSC MOU*) will be deemed U//FOUO and shared with the watchlisting community and foreign governments for watchlisting purposes pursuant to the terms of the *TSC MOU*. Accordingly, NOMINATORS should include, as appropriate, TERRORIST IDENTIFIERS in documents that contain non-releasable warnings (*e.g.,* a report is not releasable to xxx/yyy/zzz countries), unless the TERRORIST IDENTIFIERS are restricted by some other authority that limits dissemination. If U.S. PERSON information is otherwise authorized for release to the foreign government, the non-releasable warning is disabled to allow dissemination of the information.

## V. WATCHLISTING STANDARD: IDENTIFYING AND SUBSTANTIVE DEROGATORY CRITERIA

1.24 Before a KNOWN or SUSPECTED TERRORIST is added to the Terrorist Watchlist, TSC reviews the nomination to determine whether it meets the following minimum identifying criteria and minimum substantive derogatory criteria for inclusion in the TSDB.

    1.24.1 **Minimum Identifying Criteria**. Each nomination must contain minimum identifying criteria for inclusion into the TSDB. Without this minimum identifying data, the nomination is not eligible for inclusion into the TSDB, or any of the TSC's supported systems. Chapter 2 sets forth guidance regarding both the minimum identifying biometric and biographic criteria for inclusion into the TSDB. Although TIDE accepts records containing less than these minimum criteria, such records will not be exported either to the TSDB for watchlisting or to the various supported systems used by the SCREENERs absent an exception described in the Watchlisting Guidance.

    1.24.2 **Minimum Substantive Derogatory Criteria**. In addition to the minimum identifying criteria, nominations to the TSDB are accepted based on a REASONABLE SUSPICION that the individual is a KNOWN or SUSPECTED TERRORIST derived from the

---

[17] *See* Appendix 4, Addendum B to the *TSC MOU*.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

totality of the information reviewed for nomination.[18]  To demonstrate that the nomination has sufficient indicia of reliability to support this REASONABLE SUSPICION determination, NOMINATING AGENCIES should implement processes designed to ensure that nominations are free from errors, that recalled or revised information is reviewed regularly, and that necessary corrections to nominations based on those revisions/retractions are made. NOMINATING AGENCIES should, to the extent possible given the nature of the reporting, verify the accuracy and reliability of the information included in nominations. In some cases, the NOMINATING AGENCY may not be able to evaluate the reliability of the information received; however, in such situations, the NOMINATING AGENCY can ensure that the information provided is an accurate representation of the information obtained. Chapter 3 sets forth further guidance regarding the application of the REASONABLE SUSPICION standard to TSDB nominations.

## VI.   WATCHLISTING PROCESS OVERVIEW

1.25  The authorities referenced in Section II of this Chapter created the framework for the watchlisting enterprise by combining various functions of existing government entities and joining them to new organizations with counterterrorism responsibilities. The resulting watchlisting enterprise consists of ORIGINATORS, NOMINATORS, AGGREGATORS, SCREENERS and encountering agencies that are supported by the community-wide collection, nomination, and consolidation processes.

1.26  **ORIGINATORS, NOMINATORS, AGGREGATORS, and SCREENERS.**  All Executive Departments and Agencies have responsibility for collecting, collating, and sharing TERRORISM INFORMATION to support the watchlisting process. They are called ORIGINATORS because they initially collect and identify information supporting the conclusion that an individual is a KNOWN or SUSPECTED TERRORIST. An ORIGINATOR is the Department or Agency that has appropriate subject matter interest and classification authority and collects TERRORISM INFORMATION (*i.e.,* raw information) and disseminates it or TERRORIST IDENTIFIERS to other U.S. Government entities via an intelligence report (*i.e.,* finished intelligence) or other mechanism. In general, when an ORIGINATOR has identified international TERRORISM INFORMATION and determines that information should be provided to NCTC, the ORIGINATOR takes on the NOMINATOR role. A NOMINATOR is a Federal Department or Agency that has information to indicate that an individual meets the criteria for a KNOWN or SUSPECTED TERRORIST and nominates that individual to TIDE and the TSDB based on information that originated with that Agency.

1.27  While all NOMINATORS have the duty of upholding informational standards, the NCTC and TSC are distinctly responsible for ensuring data quality and the integrity of their respective repositories. NCTC and TSC are themselves potential NOMINATORS. Analysts from the

---

[18] Please note that there are also certain exceptions to the minimum biographic information and minimum substantive derogatory criteria required for Terrorist Watchlist nominations that support immigration and visa screening activities conducted by DHS and DOS. *See* Chapter 2, Section III and Chapter 3, Section V.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

NCTC may discover an individual who is eligible for watchlisting while reviewing all-source information. In these cases, NCTC analysts will request that the ORIGINATOR submit a nomination for inclusion into TIDE; or, on a limited basis or during exigent circumstances, NCTC analysts may update TIDE directly with a disseminated report and notice to the ORIGINATOR(S). In instances where disseminated reporting is used to enhance TIDE, NCTC will provide notice back to the collecting agency via TIDE. TSC may also nominate TERRORISM INFORMATION received pursuant to TERRORISM screening conducted by foreign governments.

1.28  NCTC and TSC are responsible for reviewing both newly nominated individuals, as well as subsets of existing records, to determine if additional and/or enhancement (research) is required to locate missing information critical to the watchlisting process. In some cases, this will require research to locate additional DEROGATORY INFORMATION to meet the minimum substantive derogatory criteria for watchlisting. In other cases, this will require research to locate additional biographic or biometric identifiers, in order to provide a comprehensive record maximizing the probability of confirming a POSITIVE MATCH to an identity contained in the TSDB.

1.29  AGGREGATORS are those who receive and hold TERRORISM INFORMATION and certain other non-TERRORISM INFORMATION they are authorized to receive and retain. For example, two of NCTC's main statutory missions are to serve as the (1) central and shared knowledge bank on KNOWN or SUSPECTED TERRORISTS and (2) primary organization in the U.S. Government for analyzing and integrating all intelligence information possessed or acquired by the U.S. Government pertaining to TERRORISM and counterterrorism.[19]

1.30  TSC takes on the role of an AGGREGATOR when a KNOWN or SUSPECTED TERRORIST is encountered and the individual's record is enhanced or updated with ENCOUNTER-related information. As noted in Paragraphs 1.1 and 1.7, the TSC manages the watchlisting process and plays a key role in helping Departments and Agencies determine whether an ENCOUNTER with a member of the public is one with a KNOWN or SUSPECTED TERRORIST. Additional TERRORISM INFORMATION or TERRORIST IDENTIFIERS are generated during ENCOUNTERS and the Encounter Management Application (EMA)[20] uses that information to update records of KNOWN or SUSPECTED TERRORISTS.

1.31  SCREENERS vet against the TSDB to determine if an individual is a possible match to a KNOWN or SUSPECTED TERRORIST in the TSDB. SCREENERS can include federal, state, local, tribal, territorial, or foreign governments and certain private entities. Screening officials include homeland security officers, consular affairs officers, transportation safety personnel, and officials of foreign governments with whom the United States has entered into a TERRORISM SCREENING INFORMATION sharing agreement pursuant to HSPD-6. Certain Departments and Agencies have components which perform both screening and law enforcement duties. If a

---

[19] See 50 U.S.C. §404o.
[20] EMA is an application used by the TSC to administer ENCOUNTER information.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

SCREENER believes an individual may be on the Watchlist, the screener contacts the TSC's Terrorist Screening Operations Center (TSOC). The TSOC will determine whether the individual the SCREENER has encountered is, in fact, a POSITIVE MATCH to the individual who is on the Terrorist Watchlist. The TSOC may also notify the FBI's Counterterrorism Division (CTD) that there has been a positive ENCOUNTER with a watchlisted subject. TSC's Terrorist Screening Operations Unit (TSOU) coordinates the appropriate operational response to the ENCOUNTER. Based on the TERRORISM INFORMATION made available by the ORIGINATING AGENCY, the SCREENER will take action based upon its specific authorities (*e.g.*, requiring additional screening at an airport checkpoint, denying a visa application, determining admissibility into the United States) and follow appropriate ENCOUNTER procedures, as set forth in Chapter 5.

1.32 **Collection, Nomination, Consolidation and the Use of the Terrorist Watchlist to Perform Screening Processes.** The following is a chart depicting the collection, TERRORIST nomination, consolidation and screening processes:



UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

1.33   The arrows fade inside the TSDB cylinder because not every nomination from NCTC (for international TERRORISM) or the FBI (for domestic TERRORISM) is exported from the TSDB to SCREENERS (represented by the multi-colored blocks at the far right of the chart).[21]   For example, certain categories of individuals that do not meet the minimum identifying criteria (*see* Chapter 2, Section II) or the REASONABLE SUSPICION standard (*see* Chapter 3, Section II) can be watchlisted to support immigration and visa screening activities by DHS and DOS (*see* Chapter 3, Section V) but are not exported to state/local/tribal SCREENERS or foreign partners. Similarly, when ORIGINATORS provide FRAGMENTARY INFORMATION to NCTC for inclusion in TIDE, such information will not be exported from TIDE to the TSDB, unless the NOMINATING AGENCY believes there is REASONABLE SUSPICION to believe that the individual is a KNOWN or SUSPECTED TERRORIST. FRAGMENTARY INFORMATION is provided to NCTC where it can be further analyzed, connected to existing information, and added to TIDE for export to TSDB because NCTC, and not individual ORIGINATORS, has access to all the information available to the U.S. Government on a KNOWN or SUSPECTED TERRORIST.

## VII.   ROLES AND RESPONSIBILITES FOR THE WATCHLISTING AND SCREENING COMMUNITY

1.34   Delineation of roles and responsibilities of NOMINATING AGENCIES, SCREENERS, NCTC, and the TSC is critical to provide for an effective and efficient integrated Terrorist Watchlist enterprise. While HSPD-6 describes the broad mandate of developing an integrated watchlist system, and the *TSC MOU* provides a level of detail needed to fulfill that mandate, further clarification is required to ensure there are neither gaps in the nomination process, nor wasteful redundancies.

1.35   Pursuant to HSPD-6, Departments and Agencies in the Executive Branch are required, to the extent permitted by law, to provide TERRORIST INFORMATION to NCTC. This process will be accomplished either through direct nomination to NCTC, or through a specific component designated by a Federal Department or Agency head for doing so (*e.g.*, all DOJ components are directed to nominate through the FBI; DHS Intelligence and Analysis (I&A) has oversight responsibility for all DHS nominations). Except as detailed in the sections applicable to expedited nominations (*see* Paragraphs 1.58 and 1.59), NOMINATING AGENCIES will endeavor to provide comprehensive nominations and include the maximum amount of identifying and DEROGATORY INFORMATION.[22]   NOMINATING DEPARTMENTS AND AGENCIES should prioritize

---

[21] The Terrorist Screening Database Annex D to the FBI Memorandum of Understanding with Department of Defense (DoD), signed February 22, 2012, established DoD as a screening agency customer of the TSC. The dashed line in the latter chart represents that DoD is finalizing procedures to receive and use information from the TSDB for its screening processes.

[22] In May 2010, the Deputies asked that NOMINATING AGENCIES "ensure that nominations are comprehensive and include the maximum amount of identifying and DEROGATORY INFORMATION." In 2012, the Interagency Policy Committee (IPC), in coordination with NOMINATORS, SCREENERS, NCTC and TSC, developed a prioritized list of data identifiers that are critical to screening and identity resolution activities. This *Identity Resolution and Enhancement Tiers* document is available on NCTC's Watchlisting Community of Interest portal on the Joint Worldwide Intelligence Communications System (JWICS).

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

**UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION**

the identification of new KNOWN or SUSPECTED TERRORISTS who meet the REASONABLE SUSPICION standard, along with the identifying and DEROGATORY INFORMATION most useful to watchlisting, and screening effort, as well as assisting in identity resolution.

1.36   Each Department or Agency that nominates a KNOWN or SUSPECTED TERRORIST to NCTC for watchlisting is under a continuing obligation to provide NCTC with newly identified DEROGATORY INFORMATION or exculpatory information obtained by that Department or Agency. Each Department or Agency also has the responsibility to provide NCTC with newly identified identifying and DEROGATORY INFORMATION obtained from their Department or Agency, regardless if they were the original NOMINATING AGENCY.

1.37   With the noted exception of the Visa Viper Program, Departments and Agencies should not nominate KNOWN or SUSPECTED TERRORISTS to NCTC based on information that they do not originate without first coordinating with the ORIGINATOR.

## VIII.   QUALITY CONTROL MEASURES

1.38   In order to produce and maintain the most reliable and accurate information in TIDE, TSDB, and screening databases, quality control is considered a responsibility of all entities. NOMINATING DEPARTMENTS AND AGENCIES must establish and maintain processes, including appropriate training and guidance, to ensure information transmitted to NCTC is consistent with the source of the information.

1.39   **HSPD-6 Requirements.** HSPD-6 requires the TSC to maintain thorough, accurate, and current information concerning KNOWN or SUSPECTED TERRORISTS.  For watchlisting purposes, "current" means information that the NOMINATING AGENCY reasonably believes is valid and accurate.  The requirement that information be current does not necessarily preclude information that is several years old from being included in the TSDB if there is no reason to believe the information may have changed (*e.g.,* information regarding an individual's date of birth or TERRORIST ACTIVITY was collected 20 years ago but has not been superseded by additional information is still relevant).  NOMINATORS should consider the date of the DEROGATORY INFORMATION in the context of analyzing the overall quality of the data, as well as the severity of the threat, to determine whether the individual warrants watchlisting.  The date of the DEROGATORY INFORMATION may refer to both the date the information is collected (such as a report that was collected 50 years ago) as well as the date of the information that is referenced in the reporting (such as a recent report that references an event that occurred 50 years ago).

1.40   ***TSC MOU* Obligations.**  Paragraph 15 of the *TSC MOU* provides that the TSC "will determine, according to criteria established jointly with the entity responsible for each supported system, which supported screening processes will query that entry in the consolidated TERRORIST screening database."  Pursuant to that paragraph, the TSC is required to "make these determinations based on criteria and procedures developed in coordination with the Parties to this Memorandum and in consultation with the heads of appropriate Federal

**UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION**

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

Departments and Agencies based on factors, including but not limited to, the following:

    1.40.1    the nature of the person's association with TERRORISM;

    1.40.2    the quality of the data, including credibility, reliability, and extent of corroboration; and,

    1.40.3    the extent of uniquely identifying data. . . ."[23]

1.41  **Provide Guidance and Training.**  Each Agency will provide guidance on the watchlisting business process.  Analysts will receive periodic refresher training, as needed.

1.42  **NOMINATING AGENCY Procedures.**  Each NOMINATOR providing international TERRORIST watchlisting nominations to NCTC is responsible for the accuracy of its information and has a continuing responsibility to notify NCTC of any changes that affect the validity or reliability of such information.[24]  NCTC analysts will review each nomination for TERRORIST watchlisting prior to its inclusion into TIDE and its export to the TSDB.

1.43  Each NOMINATING AGENCY should implement processes designed to ensure that nominations are free from errors, that recalled or revised information is reviewed regularly, and that necessary corrections to nominations based on those revisions/retractions are made. NOMINATING AGENCIES should, to the extent possible given the nature of the reporting, verify the accuracy and reliability of the information included in nominations.  The following represents the type of processes that each NOMINATING AGENCY shall develop that are tailored to each Agency's particular mission and operational environment:

    1.43.1  **Develop Adequate Factual Predicate.**  Each NOMINATING AGENCY will seek to obtain as much DEROGATORY INFORMATION and identifying information as practicable concerning the KNOWN or SUSPECTED TERRORIST who is being nominated.

    1.43.2  **Provide Guidance and Training.**  Each NOMINATING AGENCY will provide guidance on the TERRORIST watchlisting nomination process and ensure that analysts involved in the nomination process are trained on a periodic basis.

    1.43.3  **Require Quality Assurance Review.**  Each NOMINATING AGENCY will use a quality assurance process to review nominations for accuracy prior to forwarding the information to NCTC.

    1.43.4  **Heightened Review for U.S. PERSONS.**  The nominations of U.S. PERSONS require

---

[23] *See* Appendix 3, *TSC MOU.*

[24] PURELY DOMESTIC TERRORISM INFORMATION is provided directly to TSC by the FBI and is subject to the same conditions applicable to the nomination procedures for those associated with international TERRORISM.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

special considerations and procedures.[25]  *See* Paragraph 3.15.

1.43.5   **U.S. PERSON Determinations**. NOMINATORS must take reasonable steps to determine whether an individual is a U.S. PERSON.

1.43.6   **U.S. PERSON Review and Confirmation**. Nominations of U.S. PERSONS to the Terrorist Watchlist shall be reviewed by the NOMINATING AGENCY'S legal counsel or a designated reviewer to confirm that the REASONABLE SUSPICION standard has been met or that the nomination meets an exception to the REASONABLE SUSPICION standard, and to ensure that the nomination conforms to Agency specific U.S. PERSON authorities and guidelines.

1.43.7   **Reliability and Accuracy Limitations**. Nominations will include any limitations on the reliability or accuracy of the information.

1.43.8   **Periodic Reviews**. The NOMINATING AGENCY will conduct periodic reviews of their nominations of U.S. PERSONS to the Terrorist Watchlist, at minimum on an annual basis, when there is no corresponding FBI investigation to ensure that the U.S. PERSON continues to meet watchlisting criteria.

1.43.9   **Redress Procedures**. As per the establishment of a formal watchlist redress process (*see* Chapter 1, Section XI), entities involved in the watchlisting process shall establish internal reviews and redress procedures.

1.44   Each NOMINATING AGENCY will have procedures that facilitate the prevention, identification, and correction of any errors in information that is shared as part of the watchlisting process. Procedures will include the review of retractions and/or corrections of information that may have been used to support a nomination. In cases where a retraction or other information has become available, the NOMINATING AGENCY will promptly send a watchlist removal request or modification, as appropriate, to NCTC. Each NOMINATING AGENCY must provide notice of any errors or outdated information to NCTC immediately unless there is an articulated reason why such notification could not be made immediately. NCTC will process and transmit to TSC such corrections upon receipt.

1.45   **NCTC Review.** In addition to review by NCTC analysts, NCTC will employ a quality control process to ensure that all standards and appropriate procedures have been employed, the data is accurate, and the presentation of the material is clear, concise, and complies with established definitions and conventions. NCTC must also have processes and procedures in place to ensure the information documented in TIDE and provided to the TSC is accurately transcribed. NCTC shall ensure there is a process in place for review and/or auditing of TIDE records.

---

[25] *See* Executive Order 12333, as amended, and 5 U.S.C. 552a(e)(7).

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

1.46 **TSC Review.** TSC personnel will review the nominations received as described in Paragraph 1.56. TSC personnel evaluate whether nominations meet watchlisting standards and weigh, as appropriate, all-source analysis before accepting or rejecting a nomination. The TSC has a critical role to play in quality control, as the TSC review is the last step before any record (including a biometric nomination where no name is available) is sent to various screening systems. As with NCTC, the TSC should ensure there is a process in place for review and/or auditing of TSC nominations and TSC records.

## IX.   NOMINATION PROCEDURES

1.47 **Distinctions between U.S. PERSONS under Executive Order 12333 and Aliens under the Immigration and Nationality Act.** This Watchlisting Guidance generally adopts the definition of U.S. PERSON from Executive Order 12333 (as amended) for nomination procedures. Executive Order 12333 defines a U.S. PERSON as "A United States citizen, an alien known by the intelligence element concerned to be a permanent resident alien, an unincorporated association substantially composed of United States citizens or permanent resident aliens, or a corporation incorporated in the United States, except for a corporation directed or controlled by a foreign government or governments." The Watchlisting Guidance also contains certain exceptions to the minimum substantive derogatory standards for TERRORIST watchlisting that support immigration and visa screening activities by the DHS and DOS to determine whether ineligibilities exist for admission to the United States or visa adjudication pursuant to the Immigration and Nationality Act (INA). Because the INA defines "aliens" as any person not a citizen or national of the United States, the INA admissibility provisions also apply to Lawful Permanent Residents (LPRs), in certain circumstances, who are considered U.S. PERSONS under Executive Order 12333. Consequently, NCTC developed a mechanism in TIDE to identify and distinguish U.S. citizens from non-U.S. citizens in order to further distinguish between "aliens" under the INA and U.S. PERSONS under Executive Order 12333.[26]

1.48 **ORIGINATOR'S Nominations Procedures.** As mentioned in Paragraph 1.26, when an ORIGINATOR becomes a NOMINATOR, it prepares a nomination document and forwards it to NCTC through the NOMINATOR tool.

   1.48.1   As a general rule, NCTC will attach all disseminated communications (cables or forms) to the TERRORIST identities record as a "source" document, which will be available on NCTC Current or the Joint Worldwide Intelligence Communications System (JWICS) to individuals who have been granted access to TIDE.

   1.48.2   Because NCTC is the conduit for passing international TERRORISM INFORMATION to TSC for TERRORISM screening purposes, there is no longer a need to send watchlist requests to multiple Government Agencies. By sending a Terrorist Watchlist nomination cable to NCTC, all potential U.S. Government TERRORISM screening

---

[26] *See* INA § 101(a)(3) [8 U.S.C. 1101(a)(3)].

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

responsibilities should be accounted for.

1.48.3    The DOJ has approved a Protocol to govern TERRORIST nominations for its non-FBI components, which requires components to provide the FBI with all TERRORISM INFORMATION.[27]  The FBI is responsible for submitting watchlisting nominations based on information received from other DOJ components pursuant to the FBI's nomination procedures.

1.48.4    DHS has designated the Under Secretary for I&A as the Executive Agent for DHS' centralized TERRORIST watchlisting process and he/she shall be responsible for providing a DHS sub-mechanism for nominating all identifying or DEROGATORY INFORMATION about KNOWN or SUSPECTED TERRORISTS to TIDE.  DHS I&A is also responsible for providing training/certification programs to the components.

1.49  In providing information to NCTC for inclusion into TIDE, the ORIGINATOR is responsible for determining whether it may, by law, provide the information to NCTC, in accordance with section 1021(d)(6) of IRTPA.  This information shall be provided with any applicable caveats or dissemination controls, which will be reflected in TIDE.  The biographic and biometric identifiers derived from this information will be deemed U//FOUO for passage to TSDB unless the ORIGINATOR designates them as "TIDE Restricted," as outlined in Addendum B to the *TSC MOU*.

1.50  **NCTC Actions and Processes.**  NCTC reviews TERRORIST nominations from Federal Departments or Agencies (NOMINATORS) as described in Paragraph 1.28.

1.51  In determining whether an individual is a KNOWN or SUSPECTED TERRORIST, NCTC will rely on the designation of "KNOWN TERRORIST" provided by the NOMINATOR as presumptively valid.  This presumption can be overcome if NCTC has specific and credible information within its possession that such designation is not appropriate, at which point NCTC will provide such information to the NOMINATOR.

1.52  In reviewing whether to include the TERRORISM INFORMATION about the KNOWN or SUSPECTED TERRORIST in TIDE, NCTC reviews the totality of information.  The totality of information is evaluated based on the experience of the reviewer, and the facts and rational inferences that may be drawn from those facts, including past conduct, current actions, and credible intelligence concerning future conduct.  As part of this review, NCTC will determine if the information pertains to, or is related to, TERRORISM.  TIDE includes TERRORISM INFORMATION on KNOWN or SUSPECTED TERRORISTS and may include additional TERRORISM INFORMATION beyond what meets the minimum substantive derogatory and identifying criteria required for nominations to the TSDB, as described in Paragraph 1.24.  Upon conclusion of NCTC's review, NCTC will either accept or reject the nomination:

---

[27] *See* Appendix 7, DOJ Protocol on Terrorist Nominations.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

1.52.1    **Accept Nomination.** If a nomination contains TERRORISM INFORMATION, NCTC will create or enhance the associated TIDE record with the data contained in the nomination. If the minimum substantive derogatory and identifying criteria are met, NCTC will forward the TERRORIST IDENTIFIERS to the TSC for placement in TSDB with the NOMINATOR'S watchlist recommendation.

1.52.2    **Reject Nomination.** If a nomination does not contain TERRORISM INFORMATION, NCTC may reject the nomination. NCTC will review rejected nominations and search holdings for additional data that may support a TERRORISM INFORMATION finding. If no information is found to support the nomination, NCTC will notify the NOMINATING AGENCY of the rejection.

1.53  **Types of records in TIDE.** There are two types of records in TIDE:

1.53.1    **TERRORIST Records.** The vast majority of records in TIDE are for KNOWN or SUSPECTED international TERRORISTS. These records are labeled "TERRORISTS." Only a small percentage of TERRORIST records in TIDE concern U.S. PERSONS.

1.53.2    **Non-TERRORIST Records.** A small percentage of records in TIDE are identified and labeled "Non-TERRORISTS." [28] These records are generally of familial family members or associates of KNOWN or SUSPECTED TERRORISTS and assist DOS and DHS in, for example, adjudicating visas and immigration processing, or assist the IC in tracking KNOWN TERRORISTS. These "Non-TERRORISTS" include:

1.53.2.1    **Alien Spouses and Children of TERRORISTS.** Based on section 212(a)(3)(B)(i)(IX) of the INA, alien spouses and children of TERRORISTS may be inadmissible to the United States.[29] TIDE exports records pertaining to alien spouses and children of alien international TERRORISTS (also known as TIDE Category Code 17) to support immigration and visa screening activities by DOS and DHS;

1.53.2.2    **Other Relatives.** TIDE also includes "non-TERRORIST" records of individuals who have a close relationship to a KNOWN or SUSPECTED international

---

[28] TIDE records for non-U.S. citizens, including LPRs, with insufficient DEROGATORY INFORMATION to meet the REASONABLE SUSPICION standard (TIDE Category Code 99) and records relating to an individual who has a defined relationship with the KNOWN or SUSPECTED TERRORIST, but whose involvement with the KNOWN or SUSPECTED TERRORIST'S activities is unknown (TIDE Category Code 50) are exported to the TSDB as TSDB exceptions to the REASONABLE SUSPICION standard. Additionally, individuals described by sources as "TERRORISTS", "extremists", "jihadists", "militants", "mujahideen" or "insurgents" (TIDE Category Code 03, also referred to as a "labels plus" nomination) will be accepted into the TSDB as exceptions for export to DHS and DOS for immigration and border processing. *See* Paragraph 3.14.6. A complete list of TIDE Category Codes can be found under the "Watchlisting Criteria Guidance" section on the Intelink website at http://www.intelink.gov/tsc/legal.htm.

[29] "Any alien who. . . . is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years, is inadmissible." *See* INA § 212(a)(3)(B)(i)(IX) [8 U.S.C. 1182(a)(3)(B)(i)(IX)].

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

TERRORIST but are not alien spouses or children of a TERRORIST. For instance, the father or brother of a TERRORIST could have a record in TIDE (also known as TIDE Category Code 160). Thus, these "other relatives" could be U.S. PERSONS or non-U.S. PERSONS. Identifiers for these other relations reside in TIDE but are not exported to the TSC for watchlisting, absent independent DEROGATORY INFORMATION. Instead, these records may be retained in TIDE for analytic purposes;

1.53.2.3 **Passports.** Unrecovered lost or stolen passports in the hands of international TERRORISTS (also known as TIDE Category Code 89);

1.53.2.4 **Associates.** Individuals who have a defined relationship with the KNOWN or SUSPECTED TERRORIST, but whose involvement with the KNOWN or SUSPECTED TERRORIST'S activities is unknown (also known as TIDE Category Code 50);

1.53.2.5 **Individuals with a Possible Nexus to TERRORISM.** Individuals with a possible nexus to TERRORISM and/or TERRORIST ACTIVITY but for whom additional DEROGATORY INFORMATION is needed to meet the REASONABLE SUSPICION standard (also known as TIDE Category Code 99).

1.54 **Identification of U.S. PERSON Status in TIDE.** NCTC analysts will review the totality of information available on a subject to discern U.S. PERSON status prior to creating or enhancing a record in TIDE, whenever possible. For existing TIDE records, this status is available to the analyst in the first field of the TIDE record. In case of external nominations or ENHANCEMENTS from the IC, the standard nomination template provides a means for NOMINATORS to identify U.S. PERSON status pursuant to Executive Order 12333 and the Agency's specific guidelines. The U.S. PERSON status field on the standard nomination template is a required field and it is the responsibility of each NOMINATING AGENCY to ensure the field is properly annotated in accordance with established policy.

1.55 **Types of Records in TIDE and the TSDB.** Not all records in TIDE are included in the TSDB. For example, records with FRAGMENTARY INFORMATION that do not meet the minimum derogatory standard or records that do not meet identifying information criteria remain in TIDE and are not included in the TSDB, absent direction for temporary, threat based categories pursuant to Paragraph 1.59.[30] The nominations process for TIDE records that will be considered for entry in the TSDB begins with an automated data transfer process that moves an individual TIDE record containing the identity of a KNOWN or SUSPECTED TERRORIST or other exportable category or record nominated for watchlisting to the TSDB.

1.56 **TSC Actions and Processes.** The TSC's Single Review Queue (SRQ) enables the TSC's Nominations and Data Integrity Unit (NDIU) to review each KNOWN or SUSPECTED TERRORIST

---

[30] Certain categories of non-TERRORIST records (*see* Paragraph 1.53.2) or nominations to the No Fly and Selectee List based on an expedited waiver of "full date of birth" requirement (*see* Paragraph 4.18) may also be eligible for inclusion in the TSDB.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

record nomination to ensure it meets the watchlisting standard.[31]  The SRQ also helps ensure that all qualified records are made available to the appropriate SCREENERS for use in TERRORISM screening.  During the SRQ process, every request to add, modify, or delete a TSDB record is reviewed by a TSC analyst to ensure the accuracy of watchlisting records and the removal of inaccurate records from TSDB.

1.56.1    Within the TSC's NDIU, experienced analysts and/or designated Agency representatives serve as Subject Matter Experts (SMEs) with respect to specific databases (*e.g.,* No Fly or Selectee List) that receive TSDB data for TERRORISM screening purposes.  The NDIU currently has four types of SMEs who specialize in the information/systems from their respective organizations: DHS/Transportation Security Administration (TSA) for the No Fly, Selectee and Expanded Selectee Lists, FBI for National Crime Information Center (NCIC)/KNOWN or SUSPECTED TERRORIST File (KSTF), DOS for the Consular Consolidated Database (CCD)[32] and DHS for TECS (and its components) and the Automated Targeting System (ATS).  SMEs provide guidance regarding their specific information/systems to the TSC and watchlisting standards to their Agencies.  In some cases, the SME coordinates the data export to the supported system, provides feedback to NOMINATORS, and responds to inquiries regarding their supported system from other TSC customer Agencies.

1.56.2    Upon the conclusion of TSC's review, TSC will either accept or reject the nomination:

1.56.2.1    **Accept Nomination**.  Consistent with Paragraphs (7) and (8) of Addendum B to the *TSC MOU*, if a nomination contains the minimum substantive derogatory criteria and the minimum identifying information, TSC will create a TSDB record, include the TERRORIST IDENTIFIERS from the TIDE record, and export the TSDB record to its supported systems (*i.e.,* databases and systems eligible to receive records from the TSDB) for the benefit of SCREENERS that conduct TERRORISM screening.  The current supported systems include, but are not limited to, the following:

1.56.2.1.1    NCIC/KSTF;

1.56.2.1.2    DOS Consular Lookout and Support System (CLASS)-VISA and CCD;

1.56.2.1.3    DHS Watchlisting Service (WLS) (*e.g.,* TECS, ATS, Secure Flight);

1.56.2.1.4    TSA Transportation Security Vetting Center;

1.56.2.1.5    TSA-Office of Intelligence Analysis (OIA);

1.56.2.1.6    Tipoff United States Canada (TUSCAN);

---

[31] *See* Chapter 1, Section VIII, *supra.*

[32] CCD is an application used by DOS to administer its visa and passport applications.

1.56.2.1.7    Tipoff Australia Counterterrorism Information Control System (TACTICS).

1.56.2.2    **Reject Nomination**. If a nomination lacks either the minimum substantive derogatory criteria or the minimum identifying information, and is not an exception to those requirements (*e.g.,* TIDE Category Codes 50 or 99 as described in Paragraph 1.53.2), TSC will reject the nomination and notify NCTC directly of its determination or coordinate with NCTC to notify the NOMINATOR of its determination. Records nominated to TIDE that are ineligible for TERRORIST watchlisting may remain in TIDE until additional information is obtained to warrant either watchlisting or removal from TIDE. NCTC analysts will review all-source information for additional identifying or substantive DEROGATORY INFORMATION. If additional information is discovered, NCTC will enhance the TIDE record and submit the record to TSC for inclusion in the TSDB. The TIDE record will be reviewed again by the TSC to determine whether it is eligible for watchlisting in TSDB and export to certain supported screening systems.[33]

1.57  The number of TSC's supported systems will continue to grow as TSC, DHS, and DOS expand their domestic and international outreach efforts and finalize additional agreements to exchange TERRORISM SCREENING INFORMATION. TSC has modified the TSDB so that certain customers may query the TSDB remotely instead of receiving exports of TSDB data to their own systems.

1.58  **Expedited Nomination Procedures for Individual Nominations.** If exigent circumstances exist (imminent travel and/or threat) where an individual nomination into the TSDB needs to be expedited after normal duty hours, a NOMINATOR, with coordination from NCTC, may contact the TSC's TSOC directly. If a NOMINATOR coordinated with NCTC, the nomination will be received by the TSC via the SRQ in TSDB and the TSOC Watch Commander will coordinate with a NDIU Senior Analyst to process the nomination. A NOMINATOR may also contact the TSC directly and provide all relevant information using the following process:

1.58.1    The NOMINATOR must first contact the TSOC at 866-███████ (toll free number) or at 571-███████.

1.58.2    The NOMINATOR will be instructed by a TSOC Specialist on how to telephonically complete a Terrorist Screening Center Expedited Nomination Request Form.

1.58.3    In addition to basic identifying information, the NOMINATOR will be requested to provide a 24/7 point of contact should the KNOWN or SUSPECTED TERRORIST be encountered by a SCREENER.

---

[33] *See* Paragraph 1.24.2 *supra.*

1.58.4   Within 72 hours of contacting the TSOC, the NOMINATOR must provide appropriate follow-up documentation that articulates, through either classified or unclassified means, the substantive DEROGATORY INFORMATION used to establish the basis for TERRORIST watchlisting.

1.59 **Expedited Nomination Procedures for Temporary, Threat-Based Categories.** This provision is intended to enable categories of individuals to be temporarily upgraded in watchlist status based on current and credible intelligence information or a particular threat stream that indicates a certain category of individuals may be used to conduct an act of domestic or international TERRORISM. This temporary, threat-based expedited upgrade (TBU) is made at the direction of the Assistant to the President for Homeland Security and Counterterrorism or his/her designee (Appropriate Official) and should be narrowly tailored to address the threat.

1.59.1   The goal of this provision is to fashion a watchlisting response that is appropriate to the nature, specificity, and severity of the threat. To achieve this goal, in addition to verifying the credibility of the threat intelligence, due consideration should be given to:

1.59.1.1   The harm to public safety posed by the threat;

1.59.1.2   The clarity and specificity of the information giving rise to the threat as to time, place, method, and identity of the suspected perpetrators;

1.59.1.3   The anticipated impact on international and domestic travel, civil liberties, and foreign relations; and,

1.59.1.4   The best available screening tools, other than the No Fly or Selectee Lists, given the type and specificity of identifiers and travel data.

1.59.2   When necessitated by exigent circumstances, and where there is current and credible intelligence information or a particular threat stream that indicates a certain category of individuals may be used to conduct an act of domestic or international TERRORISM, the Appropriate Official may direct the TSC and NCTC to place categories of individuals from TIDE or TSDB on the No Fly List, Selectee List, or into the TSDB for up to 72 hours before concurrence is obtained from the Deputies or Principals Committee. To the extent practicable, the initial direction to NCTC and TSC from the Appropriate Official will be in writing. Absent DEROGATORY INFORMATION supporting individual nomination or watchlist upgrade, if written concurrence is not obtained within 72 hours of the initial direction to TSC and NCTC, the TSC will automatically remove any individuals added to the No Fly List, Selectee List, or TSDB pursuant to the TBU, until such written direction is received.

1.59.3   The addition of categories of individuals to the No Fly List, Selectee List, or TSDB pursuant to Paragraph 1.59.2 shall be effected for a period of time, consistent with the

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

nature of the threat involved, not to exceed 30 days but may be renewed for additional 30-day periods upon written approval of the Deputies or Principals Committee. A TBU is valid until the threat no longer exists. To the extent that such threat recedes or is otherwise mitigated prior to the expiration of 30 days or during any extension approved by the Deputies or Principals Committee, TSC and NCTC and members of the watchlisting community shall immediately request of the Deputies or Principals Committee to downgrade these TBUs to their original or appropriate status. All threat-based records transmitted through automated mechanisms (*i.e.*, WLS, CCD) will include a "TBU indicator" at the message level to differentiate this category of records from non-TBU records and to provide the TBU directive for which the record is upgraded.

1.59.4    Until such time as the Deputies or Principals provide additional, written guidance, DOS will defer visa actions with respect to these expedited upgrades in watchlist status.

1.59.5    Departments and Agencies will advise the Deputies or Principals of other consequences that may result from a change in watchlist status and seek guidance as to how to proceed.

1.59.6    After these categorical moves are accomplished or renewed, there will be an expedited procedure for the review of all U. S. PERSONS that are part of the TBU to ensure their watchlisting status is appropriate (including whether continued categorical watchlisting may be warranted based on the nature of the threat).

1.60 **Arbitration of Watchlisting Disputes.** If a NOMINATOR wishes to dispute TSC's watchlisting determination, it may contact NCTC (for international TERRORIST nominations) to discuss the watchlisting status and/or submit additional substantive derogatory and identifying information to support its initial nomination. Additional information provided to NCTC by a NOMINATOR will be passed to the TSC for review and final watchlisting determination. In the case of an FBI dispute over the TSC's watchlisting determination of an international TERRORIST'S nomination, a case agent must contact the TSC.

1.61 In the case of domestic TERRORIST nominations, if the FBI wishes to dispute TSC's watchlisting determination, it may contact the TSC to discuss the watchlisting status and/or submit additional substantive derogatory and identifying information to support its initial nomination.

## X.    PROCEDURES TO REMOVE AN INDIVIDUAL FROM THE WATCHLIST

1.62 A NOMINATOR desiring to remove an international TERRORIST identity record previously nominated to TIDE should contact NCTC and provide written justification for the request. NCTC will promptly process the request when received. NCTC will be the final arbiter of whether the identity is removed from TIDE and TSC will be the final arbiter of whether TERRORIST IDENTIFIERS are removed from TSDB.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

1.63 If the NOMINATOR requesting removal of an international TERRORIST identity record from TIDE is the only NOMINATOR to have provided information on that record, the removal request will be immediately processed by NCTC. The removal information is then sent to the TSC, which, in turn, makes a determination regarding removal of the TERRORIST identity from the TSDB.

1.64 If multiple NOMINATORS have provided information on an international TERRORIST identity record, NCTC will coordinate with all relevant parties in an attempt to reach a consensus on the TERRORIST identity's most appropriate watchlisting status.

    1.64.1   If the multiple NOMINATORS arrive at a consensus that the watchlisted identity is not reasonably suspected of engaging in TERRORISM and/or TERRORIST ACTIVITIES, or an applicable exception, the identity is removed from the TSDB and TIDE. In certain circumstances, NCTC may retain records in TIDE to prevent inappropriate re-watchlisting.

    1.64.2   If the multiple NOMINATORS cannot arrive at a consensus regarding the watchlisting status of an identity, TSC may decide to remove the identity from the TSDB, but NCTC may retain the identity in TIDE.

    1.64.3   For cases in which the FBI has conducted an investigation on an individual (independently nominated by another NOMINATOR) and has concluded that the watchlisted individual is not a KNOWN or SUSPECTED TERRORIST, the individual may be removed from the TSDB.[34] In such cases, the TERRORIST IDENTIFIERS from the FBI's investigation may be used to supplement the TIDE record.

1.65 The FBI will review domestic TERRORIST identity removal requests according to applicable FBI procedures.

1.66 TSC has an established, on-going process to review every record in the TSDB in accordance with Paragraph (8)(b) of the *TSC MOU* and its mission under HSPD-6 to maintain the most thorough, accurate, and current information in the TSDB. If TSC determines that the watchlisting standards are not met for an individual record, TSC will remove the record from the TSDB, in coordination with the NOMINATING AGENCY.

## XI.   REDRESS PROCEDURES

1.67 In January 2005, the TSC established a formal watchlist redress process that allows Agencies

---

[34] After an FBI determination that the individual is not a KNOWN or SUSPECTED TERRORIST, NCTC may determine-based on a NOMINATOR'S independent nomination- that the individual should remain in TIDE as records that have been fully vetted and should not be screened against (TIDE Category Code 140), the individual be watchlisted based upon the NOMINATOR'S independent determination that the individual is a KNOWN or SUSPECTED TERRORIST or that the individual warrants watchlisting based upon an exception to the REASONABLE SUSPICION standard.

that use TSDB data during a TERRORISM screening process to refer individuals' complaints to the TSC if it appears the complaints may be related to the watchlisting process. The goal of the watchlist redress process is to provide for timely and fair review of individuals' complaints and to identify and correct any errors in the TSDB.

1.68  The watchlist redress process is a multi-Agency process involving the DHS, TSC, NCTC, NOMINATORS, and SCREENERS. On September 19, 2007, Agencies participating in the watchlist redress process executed the *Redress MOU* to set forth a coordinated redress process to respond to individual complaints about adverse screening experiences.[35]

1.69  TSC's Redress Office is responsible for receiving, tracking, and researching watchlist-related complaints that SCREENERS refer to TSC. For each redress complaint received, the Redress Office conducts an in-depth analysis to determine if the person's complaint is related to a TSDB record, including a determination of whether the complainant is the watchlisted individual or merely a near-match to a watchlist record. If the complainant is the watchlisted individual, the TSC's Redress Office will determine whether the watchlisted individual still meets all the watchlisting criteria.

1.70  For each complaint, the TSC Redress Office coordinates with the NOMINATOR (via NCTC when the NOMINATOR is not the FBI), who assists in the evaluation of the complaint to ensure the most current, accurate, and thorough information available is used to review the person's watchlist status. Where appropriate and warranted by the current information and applicable criteria, a person's watchlist status may be adjusted (*e.g.,* downgraded from the No Fly to Selectee List or the person's identity may be removed entirely from the TSDB). If the redress complaint was referred to the TSC from the DHS Traveler Redress Inquiry Program (DHS TRIP), the individual's adjusted watchlist status will be provided to DHS TRIP for issuance of an appropriate response.

1.71  DHS TRIP is a single point of contact for individuals who have inquiries or seek resolution regarding difficulties they experience during their travel screening or inspection at, for example, transportation hubs like airports, or when crossing U.S. borders. The DHS TRIP website is www.dhs.gov/trip. DHS TRIP ensures a thorough review is completed by consulting and sharing information with other DHS Components and other Agencies, as appropriate, to address the issues identified by the complainant.

## XII.   PERIODIC REVIEW OF THE WATCHLISTING GUIDANCE

1.72  This Watchlisting Guidance shall be reviewed no less than every two years following the conclusion of the previous review, or as needed.

---

[35] *See* Appendix 8, *Redress MOU*; *see also* FN 16, *supra*.

## CHAPTER 2: MINIMUM IDENTIFYING CRITERIA

### I.   BIOMETRIC NOMINATIONS

2.1   Biometric information refers to the measurable biological (anatomical or physiological) and behavioral characteristics that can be used for recognition. Examples include facial photographs, fingerprints, iris scans, digital images, latent prints, DNA and gait. A biometric is sufficient to meet the minimum identifying criteria for nominations to the NCTC's TIDE and/or the TSC's TSDB, provided that the nomination also meets the minimum substantive derogatory criteria, or one of the exceptions. Biometric nominations without minimum biographic information will be provided only to those SCREENERS that have the technical capability to screen against or otherwise make assessments using the biometrics. Notwithstanding the above, all NOMINATORS are encouraged to include all available associated biographic information with any biometric nomination.

### II.   MINIMUM BIOGRAPHIC NOMINATION REQUIREMENT

2.2   **TIDE.** NOMINATORS shall provide NCTC, for inclusion into TIDE, FRAGMENTARY INFORMATION that suggests an individual may have a nexus to TERRORISM and/or TERRORIST ACTIVITIES and any additional information that will facilitate identification of these individuals. Nominations to TIDE under this section will be considered for inclusion in the TSDB if the NOMINATING AGENCY believes there is REASONABLE SUSPICION to believe that the individual is a KNOWN or SUSPECTED TERRORIST.

2.2.1 Nominations of individuals based on FRAGMENTARY INFORMATION who fail to meet the minimum identifying criteria for nomination to TSDB should be provided to NCTC for inclusion in TIDE when there is DEROGATORY INFORMATION suggesting that the individual is associated with TERRORISM and the NOMINATING AGENCY determines that there are sufficient identifiers for possibly facilitating a match to existing TIDE records. Unless otherwise directed, NOMINATING AGENCIES should prioritize the nominations of individuals who satisfy the minimum identifying criteria before addressing nominations based on FRAGMENTARY INFORMATION.

2.3   **SCREENER Discretion.** As appropriate, SCREENERS have the discretion to decide not to include in their screening systems common names received from the TSDB, where insufficient identifying information exists for identification.

2.4   **TSDB.** Nominations to the TSDB must include a **last name**. NOMINATING AGENCIES should also provide any additional identifying information available. In addition to a last name, nominations must include:

2.4.1 **first name**;

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

2.4.2 Or any **one** of the following additional identifiers:

    2.4.2.1    Full date of birth (eight digit "mm/dd/yyyy" format);

    2.4.2.2    Passport number (with or without country of issuance);

    2.4.2.3    Unique identifying numbers such as alien registration numbers, visa numbers, and social security numbers;

    2.4.2.4    Telephone number(s)[36];

    2.4.2.5    E-mail address(es)[37];

    2.4.2.6    License plate number(s).

2.4.3 Or any **two** of the following additional identifiers[38]:

    2.4.3.1    Country of citizenship, if different from place of birth;

    2.4.3.2    Place of birth (city or country), if different from country of citizenship;

    2.4.3.3    Circa or partial date of birth (partial: *e.g.,* 1960; or range: *e.g.,* 1960-1965);

    2.4.3.4    Full name of an immediate family member (*e.g.,* parent, spouse, sibling, or children);

    2.4.3.5    Occupation or current employer;

    2.4.3.6    Specific degrees received;

    2.4.3.7    Schools attended;

    2.4.3.8    Physical identifiers such as race, height, or weight;

    2.4.3.9    Unique physical identifiers such as scars, marks or tattoos;

    2.4.3.10    Street address or other sufficiently specific location information.

---

[36] Only unclassified phone numbers that are authorized for passage to TSC pursuant to Paragraph 7(m) of Addendum B to the *TSC MOU*, will be included in TSDB. *See* Appendix 4. Unclassified phone numbers will only be provided to those SCREENERS that have the technical capability to receive this data.

[37] Only unclassified email addresses that are authorized for passage to TSC pursuant to Paragraph 7(m) of Addendum B of the *TSC MOU* will be included in TSDB. *See* Appendix 4. Unclassified email addresses will only be provided to those SCREENERS that have the technical capability to receive this data.

[38] As required here, there must be two distinct identifiers that must be sufficiently specific to account for the large number of possible matches common identifiers may produce. For example, if one identifier is rather common (*e.g.,* physical identifiers), the other identifier must be more specific to permit the screening official to successfully match a record with an individual. As a further example, a nomination with the last name listed as Khan, location listed as Kabul, Afghanistan, and occupation listed as a baker alone would be insufficient for screening purposes because it is highly unlikely a successful match could be made against such data. However, a nomination with the name listed as R. Khan, location listed as residence of 123 Sunshine Street, Kabul, Afghanistan, and occupation listed as a baker at ABC Bakery, would be sufficient for screening purposes.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

## III.   MINIMUM BIOGRAPHIC INFORMATION REQUIRED FOR EXCEPTIONS TO THE MINIMUM SUBSTANTIVE DEROGATORY STANDARDS FOR TERRORIST WATCHLISTING

2.5   There are certain exceptions to the minimum substantive derogatory standards for TERRORIST watchlisting that support immigration and visa screening activities by DHS and DOS.[39] Examples of these categories of records include, but may not be limited to, records relating to an individual who has a defined relationship with the KNOWN or SUSPECTED TERRORIST, but whose involvement with the KNOWN or SUSPECTED TERRORIST'S activities is unknown (TIDE Category Code 50) and those with insufficient DEROGATORY INFORMATION TO meet the REASONABLE SUSPICION standard for watchlisting (TIDE Category Code 99).

2.6   NOMINATING AGENCIES should provide all additional identifying information available. All nominations under this section must include a **full name (first name, last name) and one of the following identifiers**:

2.6.1 Full date of birth;

2.6.2 Full passport number (with or without country of issuance);

2.6.3 Unique identifying numbers such as alien registration numbers, visa numbers, and social security account numbers;

2.6.4 Telephone number(s);

2.6.5 Email address(es);

2.6.6 License plate number(s);

2.6.7 Biometrics, such as facial image, iris scans or fingerprints.

---

[39] *See* Chapter 3, Section V.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

# CHAPTER 3: MINIMUM SUBSTANTIVE DEROGATORY CRITERIA

## I.   INTRODUCTION AND PURPOSE

3.1   TSC issued an updated U.S. Government Protocol Regarding Terrorist Nominations on February 25, 2009, that included an appendix identifying the minimum substantive derogatory criteria for acceptance of KNOWN or SUSPECTED TERRORIST nominations into the TSDB. Based on the attempted terror attack of December 25, 2009, the Watchlisting Guidance was reviewed to determine whether adjustments were needed. The revised guidance was approved by the White House Deputies Committee on May 25, 2010 and issued to the watchlisting community on July 16, 2010, after a multi-agency classification review.

3.2   This Chapter of the Watchlisting Guidance has been updated to reflect the watchlisting community's experiences with the Guidance since issuance in July of 2010 by the Deputies Committee. One of the more notable changes of this updated version of the Watchlisting Guidance is the restructuring of instances for when PARTICULARIZED DEROGATORY INFORMATION is required. Another notable change includes the re-introduction of guidance relative to the TERRORIST facilitators or supporters from an earlier version of the Watchlisting Guidance and the inclusion of additional exceptions to the minimum substantive derogatory standards for TERRORIST watchlisting that support immigration and visa screening activities of the DOS and DHS.

## II.   REASONABLE SUSPICION

3.3   For purposes of watchlisting an individual to the TSDB, the NOMINATOR should determine whether there is REASONABLE SUSPICION that an individual is a KNOWN or SUSPECTED TERRORIST.[40]

3.4   **REASONABLE SUSPICION.** To meet the REASONABLE SUSPICION standard, the NOMINATOR, based on the totality of the circumstances, must rely upon articulable intelligence or information which, taken together with rational inferences from those facts, reasonably warrants a determination that an individual is known or suspected to be or has been knowingly engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM and/or TERRORIST ACTIVITIES. There must be an objective factual basis for the NOMINATOR to believe that the individual is a KNOWN or SUSPECTED TERRORIST. Mere guesses or hunches are not sufficient to constitute a REASONABLE SUSPICION that an individual is a KNOWN or SUSPECTED TERRORIST. Reporting of suspicious activity alone that does not meet the REASONABLE SUSPICION standard set forth herein is not a sufficient basis to watchlist an individual. The facts, however, given fair consideration, should sensibly lead to the conclusion that an individual is, or has, engaged in TERRORISM and/or TERRORIST ACTIVITIES.

---

[40] In instances where REASONABLE SUSPICION is not found, NOMINATORS should also determine whether the individual should be nominated to support immigration and visa screening by DHS and DOS (*see* Chapter 3, Section V).

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

3.5 **Due Weight.** In determining whether a REASONABLE SUSPICION exists, due weight should be given to the specific reasonable inferences that a NOMINATOR is entitled to draw from the facts in light of his/her experience and not on unfounded suspicions or hunches. Although irrefutable evidence or concrete facts are not necessary, to be reasonable, suspicion should be as clear and as fully developed as circumstances permit. For additional guidance regarding the nomination of U.S. PERSONS, *see* Paragraph 3.15.

3.6 NOMINATORS shall not nominate an individual based on source reporting that NOMINATING personnel identify as, or know to be, unreliable or not credible. Single source information, including but not limited to "walk-in", "write-in", or postings on social media sites, however, should not automatically be discounted merely because of the manner in which it was received. Instead, the NOMINATING AGENCY should evaluate the credibility of the source, as well as the nature and specificity of the information, and nominate even if that source is uncorroborated, assuming the information supports a REASONABLE SUSPICION that the individual is a KNOWN or SUSPECTED TERRORIST or there is another basis for watchlisting the individual.

3.7 **Criteria and Data Quality.** To demonstrate that the nomination has sufficient indicia of reliability to support a REASONABLE SUSPICION determination, NOMINATING AGENCIES should incorporate processes designed to ensure that nominations are free of errors, and to the extent possible given the nature of the reporting, have not come from sources known or determined to be unreliable. NOMINATING AGENCIES should, to the extent possible, verify the accuracy and reliability of the information included in nominations. In addition to ensuring that nominations are free from errors, NOMINATING AGENCIES should implement procedures designed to ensure that recalled or revised information is reviewed regularly, and that necessary corrections to nominations based on those revisions/retractions are made.

3.8 **PARTICULARIZED DEROGATORY INFORMATION.** PARTICULARIZED DEROGATORY INFORMATION is the type of information relied on to determine whether REASONABLE SUSPICION is met. This is information that demonstrates the nature of an individual's or group's association with TERRORISM and/or TERRORIST ACTIVITIES that is descriptive and specific to an event or activity, and is more than a label. For example, "Subject X provides false travel documentation for Al-Qaida operatives" is PARTICULARIZED DEROGATORY INFORMATION, whereas "Subject Y is a supporter," standing alone, is not considered PARTICULARIZED DEROGATORY INFORMATION.

3.9 **Potential Behavioral Indicators.** In making a REASONABLE SUSPICION determination, NOMINATORS should consider behavioral indicators known to be associated with particular KNOWN or SUSPECTED TERRORISTS. The following is a list of a few examples of those indicators. It is not an exclusive list and it includes activity that may have innocent explanations wholly unrelated to TERRORISM. Furthermore, some activities conducted by U.S. PERSONS or activities taking place within the United States, may be an exercise of rights guaranteed by the First Amendment. Watchlisting an individual for engaging solely in

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

constitutionally protected activities is prohibited.[41]  For these reasons, it is critical that each of these activities—as with all possible indicators of TERRORIST ACTIVITY—not be judged in isolation.  Each must be viewed in the context in which it occurs and considered in combination with all other known information to ensure that any nomination based in whole or in part on this behavior comports with the standards set forth above:

3.9.1 Attendance at training camps known to the IC as facilitating TERRORIST ACTIVITIES[42];

3.9.2 Attendance at schools/institutions identified by the IC as teaching an ideology that includes the justification of the unlawful use of violence or violent extremism;

3.9.3 Repeated contact with individuals identified by the IC as teaching or espousing an ideology that includes the justification of the unlawful use of violence or violent extremism; or,

3.9.4 Travel for no known lawful or legitimate purpose to a locus of TERRORIST ACTIVITY.

## III.   KNOWN TERRORISTS

### 3.10  Definitions.

3.10.1   **KNOWN TERRORIST.**  A KNOWN TERRORIST is an individual whom the U.S. Government knows is engaged, has been engaged, or who intends to engage in TERRORISM and/or TERRORIST ACTIVITY, including an individual (a) who has been charged, arrested, indicted, or convicted for a crime related to TERRORISM by U.S. Government or foreign government authorities; or (b) identified as a TERRORIST or member of a designated foreign terrorist organization pursuant to statute, Executive Order or international legal obligation pursuant to a United Nations Security Council Resolution.

3.10.2   **TERRORISM and/or TERRORIST ACTIVITIES.**  In general, TERRORISM and/or TERRORIST ACTIVITIES are acts that: (a) involve violent acts or acts dangerous to human life, property, or infrastructure that may be a violation of U.S. law, or may have been, if those acts were committed in the United States; and, (b) appear intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of government by mass destruction, assassination, kidnapping, or hostage-taking.  This includes activities that facilitate or support

---

[41] *See* Chapter 1, Section III.

[42] Attendance at TERRORIST training camps alone meets the REASONABLE SUSPICION standard.  Note that under the INA section 212 (a)(3)(B)(i)(VIII)[8 U.S.C. 1182(a)(3)(B)(i)(VIII)], an alien who has received military-type training (as defined in section 2339D(c)(1) of Title 18, United States Code) from or on behalf of any organization that, at the time the training was received, was a terrorist organization as defined in clause (vi), is inadmissible.  Note also that 18 U.S.C. section 2339D criminalizes receiving military type training from a designated foreign terrorist organization.

TERRORISM and/or TERRORIST ACTIVITIES.[43]

3.11 **Types of KNOWN TERRORISTS for Whom REASONABLE SUSPICION is Established by Recognized Authority and for Whom Particularized Derogatory Information is Not Required.**

3.11.1 **Arrested or Convicted TERRORISTS.**[44] Individuals who have been arrested or convicted for TERRORIST ACTIVITY are considered KNOWN TERRORISTS who should be nominated. The arrest or conviction is presumed to meet the REASONABLE SUSPICION standard for watchlisting unless there is reason to believe that the information is questionable (*e.g.,* faulty or erroneous), of dubious origin (*e.g.,* poison pen, source known to be unreliable, or politically motivated) or the result of an unreliable process (*e.g.,* conviction by a court that does not adhere to minimally acceptable due process standards). Nominations should include the charge, location, and date of the arrest or conviction, if available.

3.11.2 **Individuals Identified Pursuant to Statute or Executive Order.**[45] Pursuant to Executive Order 13224, as amended, "Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism," Executive Order 12947, as amended, "Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process," and section 302 of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC), publishes, updates, and maintains an integrated and comprehensive list of designated parties with whom U.S. PERSONS are prohibited from providing services or conducting transactions and whose assets are blocked. The names on this list include persons designated under country-based and list-based economic sanctions programs, as well as individuals and entities designated under the various Executive Orders and Statutes aimed at TERRORISM. Persons designated under Executive Order 13224, Executive Order 12947, or the AEDPA are included on this integrated and comprehensive list and are 'Specially Designated Global Terrorists' (SDGTs), 'Specially Designated Terrorists' (SDTs), or 'Foreign Terrorist

---

[43] TERRORISM and/or TERRORIST ACTIVITIES include acts that the actor knows or reasonably should know affords material support to any individual who the actor knows or reasonably should know, has committed or plans to commit a terrorist activity, to a terrorist organization or to any member of such an organization. Material support includes providing a safe house, transportation, communications, funds, transfer of funds or other material benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training for the commission of an act of TERRORISM and/or TERRORIST ACTIVITY.

[44] *See* Paragraph 3.13.1 for situations involving individuals who are acquitted or against whom charges are dismissed for a crime related to TERRORISM.

[45] These authorities generally authorize the Secretary of State (in consultation with either the Secretary of the Treasury, the Attorney General, the Secretary of Homeland Security, or a combination thereof) to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of TERRORISM that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States. Additionally, leaders or members of a Foreign Terrorist Organization (FTO), an Specially Designated Global Terrorist (SDGT) under Executive Order 13224, or an organization named to the Terrorist Exclusion List (TEL) may be designated as a terrorist organization by the Secretary of State for immigration purposes pursuant to INA section 212(a)(3)(B)(vi)(II) [8 U.S.C. 1189(a)(3)(B)(vi)(II)].

Organizations' (FTOs), respectively, and should be nominated accordingly.[46] NOMINATORS should regularly check the Specially Designated Nationals List (SDNL) as individuals are added and dropped as new information becomes available.

3.11.3 **Individuals Identified as TERRORISTS Pursuant to a United Nations Security Council Resolutions (UNSCR) Concerning Al-Qaida and Associated Individuals and Entities.** Under UNSCR resolution 1267 (1999), modified and strengthened by subsequent resolutions, including resolutions 1333 (2000), 1390 (2002), 1445 (2003), 1526 (2004), 1617 (2005), 1735 (2006), 1822 (2008), 1904 (2009), and resolution 1989 (2011), sanctions measures now apply to designated individuals and entities associated with Al-Qaida, wherever located. The names of the targeted individuals and entities are placed on the Al-Qaida Sanctions List.[47] Under the UNSCR sanctions regime, the United States has an international legal obligation to prevent the entry into or transit through its territory of designated individuals listed on the Al-Qaida Sanctions List.[48] NOMINATORS should regularly check the Al-Qaida Sanctions List as individuals are added and dropped as new information becomes available.

3.11.4 **Individuals Identified as TERRORISTS Pursuant to the National Intelligence Priorities Framework of Counterterrorism.** Members of groups (not support entities) that are identified on the National Intelligence Priorities Framework of Counterterrorism, (NIPF-CT) are presumed to meet the REASONABLE SUSPICION standard so long as the group name is not just a regional or activity-based characterization. Neutral associations such as janitorial, repair, or delivery services of commercial goods do not meet the REASONABLE SUSPICION standard.

## IV.   SUSPECTED TERRORISTS

### 3.12 **Definition.**

3.12.1   A SUSPECTED TERRORIST is an individual who is REASONABLY SUSPECTED to be, or has been, engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM and/or TERRORIST ACTIVITIES based on an articulable and REASONABLE SUSPICION.

### 3.13 **Types of SUSPECTED TERRORISTS.**

---

[46] The comprehensive list of SDGTs and SDTs is accessible through the OFAC website at the following URL: http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx

[47] Narrative summaries of the reasons for listing individuals, groups, undertakings and entities on the Al-Qaida Sanctions List (where available) can be found at the following URL:
http://www.un.org/sc/committees/1267/narrative.shtml.

[48] Many persons designated under UNSCR 1267 and Executive Order 13224 are or have been engaged in financial support, facilitation, and other activities in support of TERRORISM. They often, however, do not meet the current criteria for placement on the No Fly List. DHS and DOS will review the information provided about these individuals and take actions, as appropriate.

3.13.1 **Individuals Who are Acquitted or for Whom Charges are Dismissed.** An individual who is acquitted or against whom charges are dismissed for a crime related to TERRORISM may nevertheless meet the REASONABLE SUSPICION standard and appropriately remain on, or be nominated to, the Terrorist Watchlist.[49] Each case should be evaluated based on the facts of the underlying activities, the circumstances surrounding the acquittal or dismissal, and all known DEROGATORY INFORMATION to determine if the individual should remain on the Terrorist Watchlist.

3.13.2 **Individuals Identified as TERRORISTS Pursuant to Other Internal Department or Agency Processes.** Departments or Agencies that nominate individuals associated with a terrorist group that is not designated by Statute or Executive Order (*see* Paragraph 3.11.2) or groups that fall outside of the NIPF-CT construct (*see* Paragraph 3.11.4) must have internal processes to review the activities of TERRORISTS and terrorist organizations. So long as a Department's or Agency's internal process has determined that a group is engaging in TERRORISM and/or TERRORIST ACTIVITIES, REASONABLE SUSPICION can be met for members of the group, or active participants in, that group's TERRORIST ACTIVITIES. Departments and Agencies that use this clause to recommend subjects for watchlisting are required to provide written notice to NCTC and TSC (an email will suffice) of the Department or Agency's determination. While members or active participants of such groups may be nominated without PARTICULARIZED DEROGATORY INFORMATION, the watchlisting of an individual pursuant to this clause must be based on the determination by a Department or Agency's internal processes that the group is engaging in TERRORISM and/or TERRORIST ACTIVITIES. Neutral associations like janitorial, repair, or delivery services of commercial goods do not meet the REASONABLE SUSPICION standard.

3.13.3 **Individuals Identified as TERRORISTS Pursuant to Agreements by U.S. Government Agencies/Foreign Governments for Sharing of TERRORIST Identity Data.** The U.S. Government may enter into agreements with foreign governments for the sharing of TERRORIST identity information. Pursuant to such agreements, data will be provided to the TSC for TERRORIST screening, as required under HSPD-6. The Information Sharing and Access (ISA) Interagency Policy Committee (IPC) or an IPC-designated interagency body, will make a determination, country by country, prior to the final agreement on whether the data provided will (1) be presumed to meet the standard for inclusion in TSDB; or (2) undergo the Foreign Partner Vetting Process.

3.13.4 **Individuals Identified as Associates or Affiliates of KNOWN or SUSPECTED TERRORISTS or TERRORIST Cells or Networks.**[50] Individuals who are associated or affiliated with a KNOWN or SUSPECTED TERRORIST, or TERRORIST cells or networks should be nominated when there is PARTICULARIZED DEROGATORY INFORMATION

---

[49] Because the REASONABLE SUSPICION standard required for watchlisting is lower than that required for a criminal conviction (*i.e.*, beyond a reasonable doubt), an individual that is acquitted or for whom charges are dismissed may qualify for watchlisting based on the facts and circumstances surrounding the acquittal or dismissal.
[50] This section applies as well to persons "linked to," "related" and other similar descriptors to a KNOWN or SUSPECTED TERRORIST, TERRORIST cells or networks.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

regarding the context of the relationship that gives rise to a REASONABLE SUSPICION that the individual is engaging in or has engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM and/or TERRORIST ACTIVITIES. Neutral associations such as janitorial, repair, or delivery services of commercial goods are not sufficient. Information about the pertinent activities of the KNOWN or SUSPECTED TERRORIST, TERRORIST cell or network should be included in the nomination. These nominations should include context or content to demonstrate the membership, association, or affiliation to the KNOWN or SUSPECTED TERRORIST, TERRORIST cell or network. Individuals who merely "may be" members, associates or affiliates to a terrorist organization may not be accepted into the TSDB, unless the REASONABLE SUSPICION standard is met and PARTICULARIZED DEROGATORY INFORMATION accompanies the nomination.

3.13.4.1 **Inferences that Support REASONABLE SUSPICION.** REASONABLE SUSPICION may be rationally inferred from the context of the relationship with the KNOWN or SUSPECTED TERRORIST. The following factors should be considered when determining whether REASONABLE SUSPICION may be inferred:

3.13.4.1.1 The nature of the activity engaged in with the KNOWN or SUSPECTED TERRORIST;

3.13.4.1.2 The frequency, duration, or manner of their contact;

3.13.4.1.3 A close, continuing, or direct relationship with a KNOWN or SUSPECTED TERRORIST that reasonably suggests the individual is knowingly involved in or willfully supporting the KNOWN or SUSPECTED TERRORIST'S TERRORIST ACTIVITIES; or,

3.13.4.1.4 Other malevolent or illicit factors that can be articulated that would support a REASONABLE SUSPICION that the individual is engaging in TERRORISM and/or TERRORIST ACTIVITIES.

3.13.5 **Individuals Identified as TERRORIST Facilitators.** TERRORIST facilitators are presumed to meet the REASONABLE SUSPICION standard. The nomination should include PARTICULARIZED DEROGATORY INFORMATION concerning the type of "facilitation" involved and the role of the facilitator when this information is known. Individuals who are considered facilitators include, but are not limited to, financial fundraisers, document forgers, travel facilitators, money launderers, and arms merchants. There must be REASONABLE SUSPICION that the facilitator knew that his or her actions would aid in the furtherance of TERRORISM and/or TERRORIST ACTIVITIES.

3.13.5.1 **Criminal Activity Supporting TERRORISM.** If intelligence or information indicates that the individual is engaging in criminal activity related to smuggling, providing safe houses, forging documents, or any other support to TERRORISTS or terrorist groups, NOMINATORS should presume that the individual is knowingly engaging in criminal activity that supports TERRORISM and/ or TERRORIST

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

ACTIVITIES. In these circumstances, REASONABLE SUSPICION is based on the TERRORIST criminal activity and should be described in the nomination.

3.13.6   **Individuals who Incite Others to Commit Acts of TERRORISM.**[51]  Inciting an individual to commit an act of TERRORISM and/or TERRORIST ACTIVITIES under circumstances that indicate an intention to cause death or serious bodily harm is considered engaging in TERRORIST ACTIVITY and is sufficient to meet the REASONABLE SUSPICION standard.  The nomination should include PARTICULARIZED DEROGATORY INFORMATION concerning the type of "incitement" involved and the role of the individual when this information is known.  Normally, speech will not rise to the level of "inciting" unless there is a clear link between the speech and an actual effort to undertake the TERRORIST ACTIVITY.  The individual may have incited TERRORIST ACTIVITY, even if a terrorist attack does not actually occur (*e.g.,* because an attempt to commit such activity is thwarted).  Speech advocating a violent or dangerous TERRORIST ACTIVITY is incitement if such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.[52]

3.13.7   **Individuals Who Solicit Others to Engage in TERRORIST ACTIVITIES.**  In an individual capacity or as a member of an organization, any individual who solicits another to engage in a TERRORIST ACTIVITY and/or for membership in a terrorist organization is considered to be engaging in TERRORIST ACTIVITY.  Nominations that include PARTICULARIZED DEROGATORY INFORMATION concerning the type of solicitation involved and the role of the individual are sufficient to meet the REASONABLE SUSPICION standard.  An individual may fall outside the scope of engaging in the solicitation of an individual for membership in a terrorist organization if there is information that demonstrates that the individual did not know and should not have reasonably known that the organization was a terrorist organization.

3.13.8   **Individuals Identified as Sympathizers and Supporters of a Designated Terrorist Organization.**[53]  Sympathizers and supporters of a designated terrorist organization (DTO) (*see* Paragraph 3.11.2) may be watchlisted when the REASONABLE SUSPICION standard is met, and the nomination includes PARTICULARIZED DEROGATORY INFORMATION concerning the how the individual's activities warrant watchlisting, as opposed to information about why the organization is a DTO.

3.13.8.1   A sympathizer or supporter of TERRORISM should be nominated if the support is operational in nature.  If support is merely ideological, the individual should not be nominated.

---

[51] For situations where there is no PARTICULARIZED DEROGATORY INFORMATION, individuals may be watchlisted as an exception to the REASONABLE SUSPICION standard. *See* Paragraph 3.14.3.

[52] *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 122 S.Ct. 1389 (2002); 9 FAM 40.32 N2.5, "Advocacy of Terrorism Not Always Exclusionary."

[53] For situations where there is no PARTICULARIZED DEROGATORY INFORMATION, supporters of a designated terrorist organization (DTO) may be watchlisted as an exception to the REASONABLE SUSPICION standard. *See* Paragraph 3.14.4.

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

3.13.9    **Individuals Identified as FOREIGN FIGHTERS.**  FOREIGN FIGHTERS are defined as nationals of one country who travel or attempt to travel to another country to participate in TERRORISM and/or TERRORIST ACTIVITIES, and to the extent possible, the nomination should include PARTICULARIZED DEROGATORY INFORMATION.  Behavior that qualifies as PARTICULARIZED DEROGATORY INFORMATION is the travel to a foreign country to participate in TERRORISM and/or TERRORIST ACTIVITIES.

    3.13.9.1    A person is not considered a FOREIGN FIGHTER when he or she traveled from Country A to Country B for non-TERRORIST reasons (*e.g.,* enrolling in school). Inferences that someone is a FOREIGN FIGHTER may not be drawn solely from biographic facts that indicate a person was born in one country and is found in a different country and suspected to be participating in TERRORISM and/or TERRORIST ACTIVITIES.

3.13.10    **Special Consideration for Individuals Involved with TERRORIST-Associated Weapons.**  Individuals who possess, handle, use, manufacture, sell, or transfer Improvised Explosive Devices (IEDs), Explosively Formed Penetrators (EFP), Radiological Dispersion Devices (RDD), or improvised chemical, biological, radiological, or nuclear (CBRN) devices, are presumed to meet the REASONABLE SUSPICION standard due to the inherently dangerous nature of these items or when it can reasonably be inferred from the context that there is a connection to TERRORISM and/or TERRORIST ACTIVITIES (*e.g.,* Iraq, presence of other KNOWN or SUSPECTED TERRORISTS, previous attacks on or threats to U.S. Forces).

3.13.11    **Targets of Raids Conducted by the U.S. Military or the Intelligence Community.**  REASONABLE SUSPICION is presumed where an individual was identified as the target of a raid to disrupt a FTO.  When an individual is identified by discovery of information found during the course of such a raid conducted by the U.S. Military or the IC, however, REASONABLE SUSPICION is met where the available PARTICULARIZED DEROGATORY INFORMATION explains why he or she can be reasonably suspected of engaging or having engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM and/or TERRORIST ACTIVITY.  If there is no PARTICULARIZED DEROGATORY INFORMATION on the individual for whom information was discovered during the raid, he or she should not be nominated.

3.13.12    **Individuals Identified as TERRORISTS via Documentation or Media Exploitation Efforts.**  Any individuals identified in documents or media otherwise captured by U.S. or allied forces or obtained from a NOMINATING AGENCY must have a connection to TERRORISM and/or TERRORIST ACTIVITIES in order to be nominated to the Terrorist Watchlist.  REASONABLE SUSPICION for an individual to be nominated from document and media exploitation (DOMEX) materials may be established either by the content or context of the DOMEX, or other sources.  Nominations under this section must include PARTICULARIZED DEROGATORY INFORMATION.  For example, REASONABLE SUSPICION for watchlisting can be met based on the acquisition of documents/media identifying a person from the counterterrorism operation that targeted the residence of Al-Qaida

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

leader Usama bin Laden on May 2, 2011.[54]  Likewise, individuals listed on a roster of an IED cell could be nominated solely on the presence of their name on the list.  An identity from a captured passport, however, would only be watchlisted if additional reporting documents REASONABLE SUSPICION to believe that the individual is connected to TERRORISM and/or TERRORIST ACTIVITY.

3.13.13  **LONE WOLVES.**  Because the focus is on the individual's TERRORISM-related conduct, "LONE WOLF" TERRORISTS should be nominated when PARTICULARIZED DEROGATORY INFORMATION and their actions support a REASONABLE SUSPICION that they are engaged in, or have engaged in, TERRORISM and/or TERRORIST ACTIVITIES.  No present known affiliation with a terror group, organization, or cell is required but prior affiliations, if they exist, may be taken into account for supporting a rational inference that the individual is reasonably suspected of engaging in TERRORISM and/or TERRORIST ACTIVITIES.

# V.   EXCEPTIONS TO SUPPORT IMMIGRATION AND VISA SCREENING ACTIVITIES BY DHS AND DOS

3.14  **TSDB Minimum Substantive Derogatory Exceptions to Support Immigration and Visa Screening Activities by the DHS and DOS.**  The Watchlisting Guidance contains certain exceptions to the minimum substantive derogatory criteria for TERRORIST watchlisting that support immigration and visa screening activities by the DHS and DOS to determine whether grounds exist to deny admission of aliens to the United States (including denials of visas) or to deny other immigration benefits pursuant to the INA.[55]  PARTICULARIZED DEROGATORY INFORMATION is not required for nominations made pursuant to the following sections.  Because the INA defines "aliens" as "any person not a citizen or national of the United States"[56], the INA admissibility provisions also apply to LPRs, in certain circumstances including those described in INA section 101(a)(13)(C)[8 U.S.C. 1101(a)(13)(C)], who are considered as U.S. PERSONS under Executive Order 12333.  Consequently, NCTC developed a mechanism in TIDE to identify and distinguish U.S. citizens from non-U.S. citizens in order to further distinguish between "aliens" under the INA and U.S. PERSONS under Executive Order 12333.  The following subsections are exceptions to the REASONABLE SUSPICION standard and will only be transmitted to DOS's CLASS (via the DOS CCD) and DHS's WLS to support immigration and visa screening processes.

---

[54] Such documents/media, however, still need to be reviewed to ensure that innocent individuals are not erroneously watchlisted.

[55] INA section 212(a)(3)(B)[8 U.S.C. 1182(a)(3)(B)] sets forth several grounds for inadmissibility based on terrorist activities, which is defined in INA section 212(a)(3)(B)(iii)[8 U.S.C. 1182(a)(3)(B)(iii)].  For example, INA section 212(a)(3)(B)(i)(VII) states that any alien who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization" is inadmissible to the United States.  8 U.S.C. 1182(a)(3)(B)(i)(VII)].  All other uses of the term "terrorist activities" within this Watchlisting Guidance that do not specifically reference the INA follow the definition outlined in Chapter 1 and Appendix 1.

[56] *See* INA § 101(a)(3)[8 U.S.C. 1101(a)(3)].

UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION

3.14.1  **Spouses and Children.** Spouses and children[57] of a KNOWN or SUSPECTED alien TERRORIST cannot be considered TERRORISTS without a REASONABLE SUSPICION that they are engaging or have engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM and/or TERRORIST ACTIVITIES.[58]  The INA provides that the alien spouse or alien child of an alien who is inadmissible for certain specified reasons relating to terrorist activities, if the activity causing the alien to be found inadmissible occurred within the last five (5) years, is inadmissible.[59]  An alien spouse or child of an alien who is believed to be inadmissible under the INA for terrorist activities should be nominated.  No additional DEROGATORY INFORMATION (in addition to familial relation) is required for nomination under this section, if the individual meets the below qualifications.

3.14.1.1  To qualify for watchlisting, alien spouses and children of a KNOWN or SUSPECTED TERRORIST must:

3.14.1.1.1  Be an alien (not a U.S. citizen or national), which includes LPRs; and,

3.14.1.1.2  Be an unmarried child under the age of 21 or a spouse of an alien.

3.14.1.2  Ex-spouses, widows, or widowers should not be nominated unless there is a REASONABLE SUSPICION to believe that they themselves are engaging or have engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM and/or TERRORIST ACTIVITIES.  Deceased spouses should not be nominated unless they are specifically covered in Paragraph 3.17.

3.14.1.3  Once a spouse or child no longer meets the definitional requirements under this section, such an individual should no longer be watchlisted unless there is a REASONABLE SUSPICION to believe that the individual is engaging in TERRORISM and/or TERRORIST ACTIVITIES.  For example, if a child reaches the age of 21 and there is REASONABLE SUSPICION to believe he or she was knowingly involved in TERRORIST ACTIVITY by providing material support to a FTO, he or she can remain watchlisted based upon this DEROGATORY INFORMATION.  On the other hand, once a child of a KNOWN or SUSPECTED TERRORIST turns 21 years of age, the individual should no longer be watchlisted under this exception because he or she is not considered a child of the KNOWN or SUSPECTED TERRORIST and additional DEROGATORY INFORMATION would be needed to meet the REASONABLE SUSPICION standard.

---

[57] The INA defines "child" as "an unmarried person under 21 years of age. . . ." INA § 101(b)(1)[8 U.S.C. 1101(b)(1)].
[58] The discussion in Paragraph 3.14.1 is limited exclusively to spouses and children; all other family members (including mothers, fathers, sisters and brothers) should be nominated for inclusion in the TSDB only if there is DEROGATORY INFORMATION that the individual has a close connection to a KNOWN or SUSPECTED TERRORIST and that connection meets the REASONABLE SUSPICION standard.  Absent independent DEROGATORY INFORMATION, records for these individuals may be retained in TIDE for analytic purposes. *See* Paragraph 1.53.2.2 for treatment of these other family members as "non-TERRORIST" records that may reside in TIDE for analytic purposes but are not exported to the TSDB (known as TIDE Category Code 160).
[59] *See* INA § 212(a)(3)(B)(i)(IX)[8 U.S.C. 1182(a)(3)(B)(i)(IX)].  While this provision does not apply when the activity causing the alien to be found inadmissible occurred more than 5 years before the spouse or child's admissibility is being considered, the analysis of the time limit's application will be determined by SCREENERS upon ENCOUNTER.

3.14.2    **Endorsers and Espousers.** An alien who endorses or espouses TERRORIST ACTIVITY or persuades others to endorse or espouse TERRORIST ACTIVITY or support a terrorist organization may be inadmissible under the INA and should be nominated.

3.14.3    **Incitement.** Inciting an individual to commit an act of TERRORISM and/or TERRORIST ACTIVITY under circumstances that indicate an intention to cause death or serious bodily harm is considered engaging in TERRORIST ACTIVITY. The individual may be inadmissible under the INA and should be nominated.

3.14.4    **Supporters of a Designated Terrorist Organization.** Supporters of a DTO may be inadmissible under the INA and should be nominated if the support is operational in nature. If support is merely ideological, the individual should not be nominated.

3.14.5    **Representatives.** Representatives of terrorist organizations and representatives of any political, social or other group that endorses or espouses TERRORIST ACTIVITY may be inadmissible under the INA and should be nominated. Representatives include an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization to engage in TERRORIST ACTIVITY. Neither membership in, nor association with, the organization or group is required.

3.14.6    **TERRORISTS, Extremists, Jihadists, Militants, Mujahideen or Insurgents.**[60] Nominations of individuals described by sources as "TERRORISTS", "extremists", "jihadists", "militants", "mujahideen" or "insurgents"[61], (an exclusive list) will be accepted into the TSDB as exceptions for export to DHS' WLS and DOS' CLASS-VISA and CLASS-PASSPORT for immigration and border processing when the following four conditions apply:

3.14.6.1    The individual is a not a U.S. Citizen or National (*e.g.,* the individual is a foreign national or a LPR);

3.14.6.2    The context suggests a nexus to TERRORISM;

3.14.6.3    Adequate identifiers are available to permit identification[62]; and,

3.14.6.4    The information has been evaluated as being credible.

3.14.6.5    It is important to recognize that some activities associated with extreme political or religious views expressed by aliens in the United States may constitute the exercise of rights guaranteed by the First Amendment (*e.g.,* the rights to free speech, assembly and religious exercise).[63] Therefore, someone so labeled based

---

[60] This exception is commonly referred to as "label plus" nomination.

[61] Insurgency is defined as an "organized movement" aimed at the overthrow of a constituted government through the use of subversion and armed conflict.

[62] An adequate identifier is a biometric, or a last name, first name and any one of the additional identifiers listed in Chapter 2, Section II.

[63] *See* Chapter 1, Section III concerning constitutionally protected activities.

in part on this type of constitutionally protected activity, must have other substantive DEROGATORY INFORMATION indicative of TERRORIST intent. As previously noted, nominations may not be made based solely on protected activity.

3.14.7 **Additional Derogatory Information Required (TIDE Category Code 99s and 50s).** NCTC will retain a record in TIDE if it is determined that the information pertains to, or is related to, TERRORISM.[64] However, if a record involving an alien, which includes LPRs, does not contain sufficient DEROGATORY INFORMATION to meet any of the aforementioned exceptions to the TSDB's REASONABLE SUSPICION standard for inclusion, NCTC will generally designate the record as a Category Code 99 (the TIDE category code "applied when DEROGATORY INFORMATION does not meet the REASONABLE SUSPICION standard for watchlisting because it is very limited or of suspected reliability but there is a possible nexus to TERRORISM") or a Category Code 50 (the TIDE category code applied when an individual has a defined relationship with the KNOWN or SUSPECTED TERRORIST, but whose involvement with the KNOWN or SUSPECTED TERRORIST'S activities is unknown)[65], making it available for export to TSDB for use by DOS and DHS for visa adjudication and immigration processing.

# VI.   SPECIAL CONSIDERATIONS

3.15 **Nominations of U.S. PERSONS.** Nominations of U.S. PERSONS, in accordance with the Attorney General approved procedures applicable to each element of the IC[66], will be made pursuant to the procedures set forth below to ensure compliance with this REASONABLE SUSPICION standard. Nominations of U.S. PERSONS shall be made based on information from sources of known reliability or where there exists additional corroboration or context supporting REASONABLE SUSPICION. NOMINATING AGENCIES will review information on U.S. PERSONS pursuant to procedures set forth below consistent with the nature of the reporting supporting the nomination and the protection of sources and methods.

3.15.1 Special handling is warranted for U.S. PERSONS nominated for watchlisting, especially by an Agency other than the FBI. To ensure compliance with the Watchlisting Guidance that the REASONABLE SUSPICION standard exists for U.S. PERSONS in the TSDB, as well as to ensure proper interagency coordination, a formal process has been implemented that:

3.15.1.1 Ensures the FBI is aware of U.S. PERSONS nominated by any other Department or Agency;

---

[64] *See* Paragraph 1.26.

[65] *See* FN 28, *supra*.

[66] The referenced procedures are those approved for each element of the IC pursuant to Executive Order 12333, as amended, which states in relevant part, "Elements of the Intelligence Community are authorized to collect, retain, or disseminate information concerning United States persons only in accordance with procedures established by the head of the Intelligence Community element concerned or by the head of a Department containing such element and approved by the Attorney General, consistent with the authorities provided by part 1 of this Order after consultation with the Director." *See* Executive Order 12333, Paragraph 2.3, as amended by Executive Order 13618 (July 6, 2012).

3.15.1.2    Requires review of the watchlist nomination decision and concurrence by the TSC that REASONABLE SUSPICION exists for watchlisting;

3.15.1.3    Ensures there is interagency awareness of all U.S. PERSON nominations (FBI or otherwise); and,

3.15.1.4    Ensures there is U.S. Government coordination in the investigation and/or intelligence gathering on these individuals, including strategies for engagement with foreign partners if required.

3.15.2    NCTC should include in TIDE U.S. PERSONS who are under International TERRORISM Preliminary Investigation by the FBI but who have not been deemed to meet the REASONABLE SUSPICION standard and U.S. PERSONS with a nexus to TERRORISM, but for whom there is insufficient DEROGATORY INFORMATION to support entry in TSDB. These TIDE records on U.S. PERSONS will not be provided to TSC for export via the TSDB unless approved of as an exception to the REASONABLE SUSPICION standard pursuant to Section V in this Chapter of the Watchlisting Guidance, *infra*, or as part of a TBU pursuant to Paragraph 1.59 of the Watchlisting Guidance.

3.15.3    For U.S. PERSONS nominated by other Government Agencies who are not under FBI investigation, NCTC analysts receive, process, and export these subjects for inclusion in the TSDB, as appropriate under current procedures. As part of the processing, NCTC analysts identify and share these U.S. PERSON identifiers with the FBI's Foreign Terrorist Tracking Task Force (FTTTF) for assessment, and notifying the FBI case agent of the inclusion.

3.16  **Political Figures or Purposes.** Heads of State or other Government officials should be nominated when there is PARTICULARIZED DEROGATORY INFORMATION to support a REASONABLE SUSPICION to believe the individual is engaging or has engaged in conduct constituting, in preparation for, in aid of, or related to TERRORISM and/or TERRORIST ACTIVITIES. Waivers or other appropriate action can be requested from U.S. Customs and Border Protection (CBP) in coordination with DOS to facilitate the travel of a properly watchlisted Head of State or other government officials to the extent necessary.

3.16.1    Watchlisting an individual is prohibited based on political purposes, retaliation, or any other reason unconnected to the REASONABLE SUSPICION standard.

## 3.17  **Identities of Deceased Individuals.**

3.17.1    The TSDB will not include identity information of KNOWN or SUSPECTED TERRORISTS that are confirmed dead[67] unless:

---

[67] Subjects are considered "confirmed dead" under the following circumstances:

  a.   The subject's death became a high profile case in the public sphere (*e.g.,* media footage confirming suicide bombers' deaths, 9/11 hijackers, death of Abu Musaq al Zarqawi); or,

  b.   Reporting on the subject's death has been corroborated by at least two credible sources (*e.g.,* United States or "friendly" foreign government, fully-vetted asset).

3.17.1.1 PARTICULARIZED DEROGATORY INFORMATION supports a REASONABLE SUSPICION that an existing KNOWN or SUSPECTED TERRORIST is using that identity information; or,

3.17.1.2 A recognized terrorist organization[68] collects KNOWN or SUSPECTED TERRORIST identity information for use by its members in preparing for or committing TERRORIST acts and identity or travel documents (*e.g.*, related to a deceased KNOWN or SUSPECTED TERRORIST of that organization) have not been recovered. "Trusted travel documents" include all documents used for border crossings.

3.17.2   NOMINATING AGENCIES will share information regarding a watchlisted or nominated individual's deceased status under Addendum B of the *TSC MOU*, section (7)(m) ("Any other TERRORISM INFORMATION that ORIGINATORS specifically provide for passage to the TSC"). NCTC will export deceased status to the TSC, and the TSC will export deceased status to end user screening systems. NOMINATING AGENCIES will mark deceased status information "TIDE Restricted" in cases where the status, because of sensitive sourcing, should not be forwarded to the TSC. TIDE restricted information will not be exported to the TSC. When a nomination is made on a deceased person in accordance with this paragraph, the status indicator within TIDE that is exported to the TSC will be marked to reflect that the person is deceased.

# VII.   EXAMPLES OF TERRORISM AND/OR TERRORIST ACTIVITIES

3.18 Examples of TERRORISM and/or TERRORIST ACTIVITIES may generally include conduct intended to intimidate, coerce, influence, or affect civilian populations or government policy consisting of:

3.18.1   destruction of aircraft or aircraft facilities (18 U.S.C. 32);

3.18.2   violence at international airports (18 U.S.C. 37);

3.18.3   biological weapons (18 U.S.C. 175 or 175b);

3.18.4   variola virus (18 U.S.C. 175c);

3.18.5   chemical weapons (18 U.S.C. 229);

3.18.6   assassination and kidnapping of Congressional Members, Cabinet Officials, and Supreme Court Justices(18 U.S.C. 351 (a)(b)(c) or (d));

3.18.7   nuclear materials (18 U.S.C. 831);

3.18.8   participation in nuclear and weapons of mass destruction threats to the United States (18 U.S.C. 832);

3.18.9   plastic explosives (18 U.S.C. 842(m) or (n) footnote 1.);

3.18.10   arson and bombing of Government property risking or causing death (18 U.S.C. 844(f)(2) or (3));

3.18.11   arson and bombing of property used in interstate commerce (18 U.S.C. 844(i));

---

[68] A classified list of recognized terrorist organizations that are known to reuse TERRORIST identity information is available on the Watchlisting Community of Interest portal on NCTC Current.

**UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION**

3.18.12   killing or attempted killing during an attack on a Federal facility with a dangerous weapon (18 U.S.C. 930(c));

3.18.13   conspiracy to murder, kidnap, or maim persons abroad (18 U.S.C. 956(a)(1));

3.18.14   damaging a protected computer used in interstate or foreign commerce or that is used exclusively by a financial institution or the United States Government (18 U.S.C. 1030(a)(1); 18 U.S.C. 1030(a)(5)(A)(i) resulting in damage as defined in 1030(a)(5)(B)(ii) through (v));

3.18.15   killing or attempted killing of officers and employees of the United States (18 U.S.C. 1114);

3.18.16   murder or manslaughter of foreign officials, official guests, or internationally protected persons (18 U.S.C. 1116);

3.18.17   hostage taking (18 U.S.C. 1203);

3.18.18   damage to Government property (18 U.S.C. 1361);

3.18.19   destruction of communication lines, stations, or systems (18 U.S.C. 1362);

3.18.20   injury to U.S. aircraft or vessels (18 U.S.C. 1363);

3.18.21   injury to U.S. diplomatic, consular, military, or other property (18 U.S.C. 1363);

3.18.22   destruction of an energy facility (18 U.S.C. 1366(a));

3.18.23   Presidential and Presidential Staff assassination and kidnapping (18 U.S.C. 1751(a), (b), (c), or (d));

3.18.24   acts of violence against railroad carriers and against mass transportation systems on land, on water, or through the air (18 U.S.C. 1992);

3.18.25   destruction of national defense materials, premises, or utilities (18 U.S.C. 2115; 18 U.S.C. 2156);

3.18.26   violence against maritime navigation (seizing a ship by force, destroying a ship or damaging its navigation systems) (18 U.S.C. 2280);

3.18.27   violence against maritime fixed platforms (an artificial island, installation or structure permanently attached to the sea-bed for the purpose of exploration or exploitation of resources or for other economic purposes (18 U.S.C. 2281);

3.18.28   homicides and other violence against U.S. nationals occurring outside of the United States (18 U.S.C. 2332);

3.18.29   the use of weapons of mass destruction (18 U.S.C. 2332a);

3.18.30   acts of TERRORISM transcending national boundaries (18 U.S.C. 2332b);

3.18.31   bombing of public places and facilities (18 U.S.C. 2332f);

3.18.32   producing, transferring, or threatening to use missile systems designed to destroy aircraft (18 U.S.C. 2332g);

3.18.33   producing, transferring, or threatening to use radiological dispersal devices (18 U.S.C. 2332h);

3.18.34   harboring TERRORISTS (18 U.S.C. 2339);

3.18.35   providing material support to TERRORISTS (18 U.S.C. 2339A);

3.18.36   providing material support to terrorist organizations (18 U.S.C. 2339B);

3.18.37   financing TERRORISM (18 U.S.C. 2339C);

3.18.38   receiving military-type training from a FTO (18 U.S.C. 2339D);

3.18.39   torture (18 U.S.C. 2340A);

3.18.40   developing, transferring, possessing, or threatening to use atomic weapons (42 U.S.C. 2122);

**UNCLASSIFIED//FOR OFFICIAL USE ONLY/SENSITIVE SECURITY INFORMATION**

3.18.41   sabotage of nuclear facilities or fuel (42 U.S.C. 2284);

3.18.42   aircraft piracy (49 U.S.C. 46502);

3.18.43   assault on a flight crew with a dangerous weapon (49 U.S.C. 46504);

3.18.44   carrying a weapon or explosive aboard an aircraft (49 U.S.C. 46505(b) or (c); 49 U.S.C. 46506 if homicide or attempted homicide is involved);

3.18.45   damaging or destroying an interstate gas pipeline facility, an interstate hazardous liquid pipeline facility, or either an intrastate gas pipeline facility or intrastate hazardous liquid pipeline facility (49 U.S.C. 60123(b)); or

3.18.46   manufacturing, distributing, or possessing controlled substances intending to provide anything of pecuniary value to a FTO, member, or group (Section 1010A (iv) of the Controlled Substances Import and Export Act).